## VULCAN MFG. CO. v. MAYTAG CO. *
### No. 9947.

Circuit Court of Appeals, Eighth Circuit.
Sept. 25, 1934.

Rehearing Denied Nov. 2, 1934.

*Writ of certiorari granted 55 S. Ct. 347, 403, 79 L. Ed. —

William G. Boatright and Armwell L. Cooper, of Kansas City, Mo. (Daniel S. Millman, Cooper, Neel, Kemp & Sutherland, and Ringolsky, Boatright & Jacobs, all of Kansas City, Mo., on the brief), for appellant.

George Mankle, of Chicago, Ill., and Nelson E. Johnson, of Kansas City, Mo. (Wallace R. Lane and Parkinson & Lane, all of Chicago, Ill., on the brief), for appellee.

Before STONE, Circuit Judge, and JOYCE and BELL, District Judges.

STONE, Circuit Judge.

Appellee, as licensor under various patents, brought this action to enjoin appellant, its licensee, from violation of the license and for an accounting of damages on account of violations. Upon final hearing the court decreed a permanent injunction, an allowance of damages, and appointed a master to take the accounting in damages. From that decree this appeal is brought.

The patents covered by the license had to do with a swinging wringer and its gear mechanism for use on power-operated washing machines. Appellee granted a license to en-

dure until expiration of the longest patent covered thereby, under certain conditions set forth in the license, in return for payment of a fixed royalty for each swinging wringer and gear mechanism made and sold by the licensee. One of the conditions of the license was to manufacture and sell "swinging wringers and gear mechanisms shown in the attached circular, *for use only in connection with and as a part of power-operated washing machines of the general type and design shown in the circular attached hereto and made a part hereof* under said patents and patent application, and to sell the same in accordance with the provisions hereinafter contained." (Italics added.)

A related provision of the license is as follows: "Second party further agrees not to sell any of said patented devices separately or as a part of any other mechanism *than on the washing machines made by it of the general type shown in the attached circular* to any person, firm or corporation, except for repairs to machines previously sold by second party." (Italics added.)

Attached to and made part of the license were illustrations and descriptions of the washing machine manufactured by the licensee and referred to in the license in the two above quotations.

After proceeding under this license for several years, the licensee abandoned the type of washing machine formerly made by it and covered by the license. Refusing to cease attaching the wringers and gearing covered by the license to this new type of machine this action resulted. In the court below there were issues as to the construction of the license and as to whether this new machine was a departure therefrom, but those issues are not in the appeal, so we may enter our consideration with the established situation that attachment of the licensed apparatus to the machines made and being made by appellant is a violation of the terms of the license. The issues on this appeal concern the binding effect of the license under the situation here presented.

### I. Invalidity of License.

One important issue urged here is that this license is invalid as a violation of the Clayton Anti-Trust Act § 3 (15 USCA § 14). The basis of this contention is that the wringer and gear mechanism covered by the patents and the license are for attachments to power-operated washing machines, which are not covered by patents; that such attachments are necessary to salability of such

washing machines; that to limit, through license, the use of the patented device to a particular kind of washing machine, thus preventing its use upon other and more desirable types of washing machines which are manufactured by appellant, has the effect of giving appellee a monopoly over unpatented articles through the device of such character of license.

It may be conceded that the evidence establishes that it is difficult, if not impractical, to dispose of power-operated washing machines without the wringer and gearing attachments covered by these patents. Also, that there are various types of washing machines, and that a limitation of license to a less desirable and salable washing machine would seriously hamper, if it did not practically prevent, competition with a more desirable and a more salable machine, and that this lessening of competition would have a tendency to create a monopoly. Also, that these patents cover only the wringer and gearing mechanism, and have no reference to the washing machines themselves.

These concessions, however, fall short of establishing a situation which invalidates this license. It is well established that the essence of a patent is monopoly in the subject-matter of the patent. E. Bement & Sons v. National Harrow Co., 186 U. S. 70, 91, 22 S. Ct. 747, 46 L. Ed. 1058. The sole incentive offered by the patent laws to encourage development in the arts and sciences is the right to this monopoly for a given term of years. It is not against such kind of monopoly that the anti-trust laws are aimed or to which they have any application. It is true, however, that it is possible for a patentee to so employ the force of this legitimate monopoly, through a license, through sales of the patented article, or otherwise, as to effect another and additional monopoly unrelated to that accorded by the patent. When this is done, such license, sales, or other device is unlawful. In declaring the rule of law applicable to this latter situation the Supreme Court has said that the patentee may grant a license "upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure." United States v. General Elec. Co., 272 U. S. 476, 489, 47 S. Ct. 192, 196, 71 L. Ed. 362. Therefore, the question here is whether the condition of this license (that the patented matters should be used only in connection with a particular type of washing machine) is reasonably within the reward of monopoly granted by the patent.

Obviously, there was no obligation on the patentees to grant any license whatsoever. If the situation in the washing machine business was such that there would be no commercial demand for washing machines without these patented attachments, the natural and legitimate result flowing from the monopoly of these attachments would be a monopoly of the washing machine business, although the machines themselves were entirely unpatented. This is a situation brought about by the excellence of the patent in a commercial sense, and not by any arrangement, contract, or other act of the patentee than the bare ownership of the patent and the monopoly of use of the subject-matter covered thereby. If this be the situation of the evidence, the only effect of granting a license to use the patented attachments would be one beneficial to the licensee, since it would enable him to continue in a business where he could not commercially remain without the license. Obviously, the patentee is not compelled to choose between granting full and complete use under the patent or granting no use. He may attach such limitations upon the use as do not go beyond the influence of his complete monopoly without granting licenses. Under the situation here, it is clear that this limitation in the license to use of the patented attachments to certain types of washing machines is well within the monopoly of the patent. The very fact that appellant insists on going outside of the license, and testifies (through its president) that it would have to go out of business unless it did, is convincing that the commercial situation is such that the monopoly of these patented attachments has the practical effect of a monopoly of the power driven washing machine business. None of appellant's rights are invaded by this limitation, since it may cease using the patented device and manufacture any character of washing machines it desires with any other wringer and gearing attachments or with no such attachments. As to it, the difficult situation is one naturally resulting. It has no standing of itself to claim a right to use the patented device. Nor is the public harmed by this limitation, because the patentee is entitled to all the benefits naturally flowing from the monopoly of his patent and, under the commercial situation here shown, a natural benefit of this monopoly is its extension to the entire machine. This limitation in the license is well within the language and the intent of the rule as quoted above from the Supreme Court.

## II. Estoppel, etc.

It is quite evident that the main reliance of appellant in the court below and here is upon its contention that the conduct of appellee in connection with the violation of the license by appellant is such as to defeat this action. In presenting this matter, the ingenuity of able counsel has left no legal ground untouched. They claim estoppel, ratification, acquiescence, approval, implied license, waiver, election, and kindred doctrines. While there are differences in the rules of law governing these various grounds, it seems unnecessary to burden this opinion with such legal definitions, as we are convinced there is no ground in the evidence for sustaining any of them. This involves a discussion of the purport of so much of the evidence as relates to these matters.

Prior to 1927, appellant discovered that the type of washing machine (as distinguished from the patented attachments) which it was making was being replaced in the purchasing public esteem by machines differently constructed and differently performing the washing operation. Thereupon, it set to meet this change in public demand. The result was that it devised the machine objected to by the licensor. By September or October, 1927, it had constructed, by hand, a working model. Convinced of the practicability and sales attraction of this construction, it laid out money for dies and machinery designed for production of this new type machine. In the December, 1927, number of a trade journal it advertised this new machine, describing it and offering introductory samples on attractive terms. A few machines were produced in the last days of that month. There was a small production in January, 1928, an increase in the subsequent months until "good production" was reached in June, 1928. From thence on to the trial, it produced this machine for several years, replacing the form and character of material of the washing tub in later models, but preserving in all the washing machinery and methods.

The situation relied upon by appellant to show estoppel, etc., is made up of various items concerning each of which something should be said. One of these is that appellee, with full knowledge that appellant intended to make this new machine and apply thereto the licensed articles and knowing that such would require the expenditure of substantial money for dies and machinery to make this change, stood by and did not object until after such expenditures had been incurred. The

evidence does not justify this position. As to these matters, there is but one dispute in the evidence as to which there is a direct conflict, depending on the remembrance or veracity of the two conflicting witnesses and without anything in the evidence outside of their testimony to point to a determination of that conflict in favor of appellant.[1] The trial court found that the first information appellee had of this contemplated change in type of machine was in January, 1928. We think this finding is slightly inaccurate. The first information coming to appellee was some time in December, 1927, when the above advertisement in the trade journal was brought to the attention of the chairman of the board of the Maytag Company. On December 14, 1927, this chairman (F. L. Maytag) notified his district manager, at Kansas City, that appellant was "advertising a cast aluminum tub, which in appearance to the laymen would be recognized as the Maytag"; and that the advertisement stated appellant would, during December only, ship a sample machine at carload discount. He requested that Ireland procure one of these machines through one of the Maytag nearby dealers and ship it "as soon as you get it. Your prompt attention to this will be appreciated." To this Ireland replied, December 16th, that he had arranged to have a dealer at Liberty, Mo., order the machine and ship it direct from Kansas City, stating, "they hope to be able to do this tomorrow or Monday at the latest." There was a further letter from Ireland to Maytag, of December 17th (not set out but referred to in the record), advising that appellant would not be in production until after January 1st. To this Maytag answered, on December 19th, suggesting that Ireland have the dealer "submit his order and let it stand for delivery as soon as the machine is in production." The thirteenth machine produced was delivered to the dealer, about January 16th, and promptly shipped to appellee, at Newton, Iowa, where it seems to have been received about January 24th. It was then sent to the attorneys of appellee, in Chicago, for their inspection and action. April 2, 1928, the attorneys wrote appellant calling atten-

tion to the terms of the license limiting the application of the licensed articles to the type of machine covered thereby; calling attention to a recently litigated case between appellee and another company in Ohio, regarding a similar subject-matter; and demanding that appellant immediately discontinue the use of the patented wringers on this new machine and discontinue marking such machines licensed thereunder, and also informing them that unless they heard promptly appellee would be obliged to take steps necessary to prevent such "wrongful acts." Shortly after receipt of this letter the president of appellant made a trip to Toledo to investigate the litigation referred to in the above letter. Although he determined that the decree entered in that litigation was by consent, he sent an attorney to Chicago to confer with the attorney of appellee regarding the matter. The result of this conference was that appellant's attorney was told that appellant could not attach the licensed mechanism to that machine.. Thereafter, appellant continued to make the machine and, apparently, to build up production, since his testimony is that "good production" was not reached until June. July 19, 1928, this suit was filed. The above recital makes clear that there was no standing by on the part of appellee. As soon as it had information of the change it acted to procure an actual machine for submission to its counsel for their judgment of the rights of appellee. It obtained this machine as soon as possible, and it was promptly submitted to counsel. About a month after such submission the above letter of April 2d, notifying appellant that it was violating and must cease violating the license, was sent. After that letter there appears to be no unjustifiable delay in bringing the action. Another matter which should be noticed in this connection is the expenditure claimed by appellant. The testimony shows a total expenditure of something over $64,-000. Of this amount, over $16,000 was spent before production began; that is, before appellee had knowledge of the change in machine. $35,000 was spent after April 2d, when the notice of violation was sent to ap-

[1] This conflict is as to whether the witness Shaeffer, divisional manager of appellee, at Kansas City, was shown the working model at the plant of the appellant some time in September or October, 1927 (when he was division manager of Oklahoma). The president of appellant testified that this was true. Shaeffer testified that he had never seen the machine at that time, and had never been in the plant. The president of appellant also testified that two salesmen of appellee had seen the model in the plant during the above two months. There was, however, no evidence that these salesmen had communicated that information to any officer of appellee, and, obviously, the knowledge of the salesmen was not the legal knowledge of appellee.

pellant; thus, more than $51,000 of the more than $64,000 spent was expended either before knowledge of appellee or after notice to appellant. There was neither standing by on the part of appellee nor any expenditure by appellant which was induced by the attitude of appellee.

Another matter strongly pressed by appellant is that royalties were accepted and retained upon the changed machines. This is true, but it is also true that appellee had a legal right to such royalties; the question here being whether its acceptance and retention thereof was an indication that it consented to the violation of the license or was such action that appellant might properly infer such consent and act thereon. When it is considered that the matter was under investigation until April 2, 1928, was in suspension between then and the time suit was filed, on July 19th following, and that this suit was filed, it seems impossible for the appellant to reasonably infer any such consent. There is no basis for such position. To this may be added that the evidence clearly shows that this action of appellee had not the slightest influence upon appellant continuing its violation of the license. The reason why it continued to violate this license is tersely stated by its president, who, being asked as to his going ahead with plans to complete the machine and put it on the market after investigating the Ohio case, answered, "We had no alternative. It was either 'that or go busted."

In August, 1928, and because of a suggestion from its counsel, appellee instructed the National Household Devices Company, which was the royalty collecting agency of appellee, to write appellant not to send any royalties on the new machine, and to advise it whether appellant had been paying royalties on the new machine and, if so, the amount thereof, "with the understanding that it should be refunded to you." This letter was referred by appellant to its counsel, who wrote a careful, noncommittal answer, stating that they regarded the letter as "but a studied attempt to lay a foundation for Mr. Maytag and his company to avoid the legal consequences of their knowledge and acts," and stating that Mr. Maytag and his company had known for a long time that the royalties were being paid on "all machines" manufactured by appellant, and that all of such machines had been manufactured with the knowledge, acquiescence and approval of the Maytag Company, both by words and by conduct. The letter also stated that all royalties that had been paid "have been properly paid

and properly due under its contract and subsequent circumstances, and it expects to continue to pay the royalties thereunder in the future, the same as it has in the past." This correspondence seems to have ended this attempt at segregating future or refunding past royalties. We see nothing in this situation concerning the royalties to avoid the effect of the license.

Another item bearing upon this matter is the furnishing of license labels to place upon the machines made by appellant. This matter, standing alone, might cause hesitation, although it is explainable on the theory that certainly up into 1931, appellee had no reason to believe that all machines made and sold by appellant were violative of the license, and since it had requested (in August, 1928) information concerning the number of machines in connection with the royalty payments and had been rebuffed it might, without loss of right, continue to furnish labels. But when this item is considered in the entire situation, it is impossible to give it great importance. There was never a moment from the letter of protest of April 2, 1928, when appellant did not know that appellee was vigorously denying the right of appellant to apply the licensed attachments to any machines except those covered by the license. It never had reason to believe any change in that position, and it never acted in reliance upon any such change.

Another matter is the contention of appellant that others under licenses of identical form were permitted to use the licensed apparatus on washing machines other than covered by their licenses. Whether this is true or not, or the reason therefor, is of no consequence to appellant. It cannot affect the rights of the parties under this license. There is no business or legal connection between this license and that to any one else. Each stands upon its own terms, and the action of appellee in regard to any one of them has no effect upon the legal rights of the parties to any other license.

Another matter, not greatly stressed here, is delay in prosecution of this action to judgment. The record reveals the suit filed July 19, 1928. A considerable number of pleadings resulting in a reply to an amended answer and cross-bill, filed December 8, 1930, followed by defendant's application for commission to take depositions, filed December 27, 1930, allowed by order, March 18, 1931, depositions taken as late as November 2, 1931, by appellant, with trial beginning July 7,

142

1933. This record, unquestionably, shows delay in determination of this suit, but to what such delay is attributable does not at all appear in the record. If appellant desired to rely upon this ground, it should have presented and preserved in the record evidence justifying the conclusion that culpable delay was attributable to appellee.

### III. Admission of Evidence.

Appellant presents here claimed errors in connection with the exclusion of two pieces of evidence. The first of these occurred during the redirect examination of the president of appellant. He was asked if, at the taking of the depositions, in October or November, 1931, a statement was made to Mr. Magtag, either by witness or by examining counsel, "with reference to the royalties that had been paid and on what machines they had been paid." An objection to the competency of this testimony was sustained, and counsel made an offer of proof that Mr. Maytag had been then informed "what royalties had been paid on the particular type of machine, including the machine in controversy." Obviously, the purpose of this offer was to bring home, as of that date, knowledge to appellee that it was receiving royalties in connection with the objectionable machines. This testimony was admissible, but, in view of what has been above expressed concerning the effect of receipt and retention of the royalties, we are certain that its exclusion was harmless error.

The second piece of evidence has to do with the same general matter, that is, with notice that the royalties, in whole or part, were in connection with the new machine. Appellant had taken the deposition of H. W. Power, secretary of the National Household Devices Company. The patents covered by this license had been issued to various parties who had combined the ownership in the Maytag Company under an agreement to share royalties from licenses according to a specified percentage. This agreement provided that the National Household Devices Company, a separate corporation, should act as the royalty collecting agency. Such collections were paid over by it to a trustee who made the distribution among the parties to the agreement. The license contract here involved provided that the royalties should be paid to National Household Devices Company, and that appellant would allow that company "as the duly authorized representative of first party [appellee] to inspect its books at all reasonable· times for the purpose of ascertaining the accuracy of such reports," meaning monthly royalty reports by appellant. Power was the individual in the Household Company who checked up and verified the reports and royalty payments of licensees. At the trial appellant did not offer the deposition of Power which it had taken, but offered extracts therefrom as admissions of appellee against interest. These admissions had to do with knowledge gained by Power, from checking the books and reports of appellant in connection with royalty payments, that royalties were being paid covering the objectionable machines; and the amount of such payments thereon. An objection that Power was not shown to be the agent of appellee so that his knowledge was that of appellee was sustained. The evidence abundantly sustains that ruling. The trial court held that it had been shown that Power was the agent of appellee in collecting and checking up royalties, but that it had not been shown that he was a general agent for all purposes. The evidence sustains this ruling of the court, and goes no further.

Counsel for appellant have presented this case with great ability, but even such ability cannot overcome the law and the facts, and the decree should be, and is, affirmed.