**McCULLOUGH v. KAMMERER CORPORATION et al. (two cases).**

No. 11122.

Circuit Court of Appeals, Ninth Circuit.

Feb. 26, 1948.

BONE, Circuit Judge, dissenting.

R. Welton Whann, of Los Angeles, Cal., A. W. Boyken, of San Francisco, Cal., and Robert M. McManigal, of Los Angeles, Cal. (Boyken, Mohler & Beckley and W. Bruce Beckley, all of San Francisco, Cal., of counsel), for appellant.

Frederick S. Lyon, Leonard S. Lyon and Mark Herron, all of Los Angeles, Cal., for appellee.

William C. Dixon and Wallace Howland, Sp. Assts. to Atty. Gen., Julian Caplan, Sp. Atty., of San Francisco, Cal., and John F. Sonnett, Asst. Atty. Gen., for United States of America, amici curiæ.

Before DENMAN, BONE and ORR, Circuit Judges.

DENMAN, Circuit Judge.

McCullough appeals from an interlocutory decree holding that Kammerer Corporation, hereinafter called the patentee, is entitled to damages for McCullough's infringement of patentee's patents for cutting pipe in oil wells and an accounting thereof, and denying McCullough's motion to set aside a prior interlocutory order for the accounting and to dismiss the two complaints (consolidated for trial) brought against him for such infringement by the patentee and Baash-Ross Tool Company, hereinafter called the licensee, on the ground that the licensing contract between the licensor and licensee was against the public interest.[1]

One of McCullough's contentions respecting the patentee's conduct in the exploitation of its patent is that its licensing contract with the licensee[2] violated the public interest. That contract not only gave the licensee an exclusive license to manufacture and use (but not to sell) the pipe cutter in the United States and its territories but prevented both the licensor and licensee from acquiring or using any other pipe cutter. The challenged provisions of the contract are

"11. The Licensee covenants and agrees during the term of this license agreement not to manufacture or use or rent any device which will be in competition with the device or devices covered by this license agreement.

"12. The Licensor covenants and agrees that during the term of this agreement, not to manufacture, sell, rent, license, use, or in any way do business with the device or devices covered by this agreement or with devices which will come or be in competition with the device or devices covered by this agreement."

These covenants extend the monopoly of the patent by preventing competition with the patent of any other pipe cutter, patented or unpatented, manufactured, used or sold by the licensee, theretofore engaged in making pipe cutting tools. The licensor to procure such extension of the monopoly area of its patent also *binds itself* to extend the area of the monopoly by a similar restrictive agreement.

In addition it appears that the patentee is a corporation having as its general manager an inventor of pipe cutters as well as two of its officers also such inventors. Its agreement to extend the patent monopoly by eliminating competition is aided by its agreement not to avail itself of the inventive genius of its employees in creating competitive devices which is can "manufacture, sell, rent, license, use or in any way do business with."

It cannot be said that these are matters *de minimis* and not of substance. The patentee appellee describes the licensee as "a very large company" doing a world-wide business. Its operators went from state to state to operate the cutter. The evidence shows licensee's business in the United

---

[1] Cf. McCullough v. Kammerer, 9 Cir., 138 F.2d 482, affirming the first interlocutory decree and id. 323 U.S. 327, 65 S.Ct. 297, 89 L.Ed. 273, and Id., 9 Cir., 148 F.2d 525, respecting the contention of unclean hands urged, but not decided, on appeal but committed to the district court for its consideration.

[2] The contract was made on October 18, 1923, with the L. F. Baash Perforator Company which manufactured the pipe cutter and serviced oil well companies with it. On November 1, 1924, L. F. Baash Perforator Company assigned the licensing contract to Baash-Ross Tool Company which took over the servicing as well as the manufacture of the cutter. The Perforator Company was then merged with the Baash-Ross Tool Company, the licensee here.

States alone extended to the oil wells of companies in eleven states. In 1923, the year the challenged contract was made, the income from the rental of the cutter to such oil companies amounted to $212,760. At the rental agreed in the licensing contract of $190 for each cutting, this amount shows that in that year wells were so serviced over these states by 1172 such cuts. The total income from such cuts in 15 years amounted to "something like about" $2,-500,000 from "the running by the Baash Tool Company of the Stone and Reilly cutter."

The district court found at the trial on the issue of infringement that the licensee had a monopoly of the field of pipe cutting in the United States, all other cutters being supplanted by the cutter of which it had the patent monopoly.

Nothing could more discourage inventors or manufactures of better competitive cutters than to take from them the patronage of the only person then using or cutting with the only device used in cutting broken pipe in all the oil fields of the United States. While it is true that this exclusive occupation of cutting in all these fields arose after the making of the challenged contract, what was *aimed* at by the contracting parties was just such success. What they *feared* is shown by the challenged covenants, withdrawing both parties from the field of inventing or using competitive devices.

In this situation the contention is entirely irrelevant that neither party was harmed by the agreement. The question is, "Was the public harmed?" We think the district court erred in holding it was not and are in accord with the Third Circuit that these restrictions are against the public interest and warrant a court of equity in refusing the relief here sought. In National Lockwasher Co. v. George K. Garrett Co., 3 Cir., 137 F.2d 255, 257, that court states:

"The standard form of contract used by the plaintiff in licensing agreements was in evidence. That contract contains a clause that '(g) Licensee agrees that, while this agreement is in force, it will make and sell no form of non-entangling Spring Washers except such as are covered by said patent, and that it will not, either directly or indirectly, make or sell Spring Washers of the kind specifically excluded from this license under the provisions of Paragraph First (a) hereof.' There was no dispute that this provision appeared in the licensing agreements given by the plaintiff to those who sought to make spring washers utilizing the plaintiff's patent.

"We think this is enough; enough to show that the plaintiff was using its patent to suppress competition with it by non-patented articles. To the extent that the policy was successful the supply of competing nonpatented washers would, of course, disappear.

"Said Mr. Chief Justice Stone in United States v. Univis Lens Co., Inc., 1942, 316 U.S. 241, 251, 62 S.Ct. 1088, 1094, 86 L.Ed. 1408: 'In construing and applying the patent law so as to give effect to the public policy which limits the granted monopoly strictly to the terms of the statutory grant, Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363, the particular form or method by which the monopoly is sought to be extended is immaterial.' This statement of principle covers the situation here. The patentee has disentitled itself to recover at present for infringement by reason of its utilization of its patent monopoly to drive unpatented competing goods from the market." [3]

We agree with that circuit that there is no difference in principle between extending the monopoly of the patent by suppressing the manufacture or use of competitive devices, patented or unpatented, and the extension of the monopoly by prohibiting the use in making the patented article of unpatented articles competing with those made by the licensor's subsidiary, held against the public interest in Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 493, 62 S.Ct. 402, 86 L.Ed. 363. As stated in

---

[3] Cf. Pope Mfg. Co. v. Gormully, 144 U. S. 224, 236, 237, 12 S.Ct. 632, 634, 36 L.Ed. 414, where, in part, the agreement held against public policy provided that the licensee during the life of the licensed patents, "agrees never to import, manufacture, or sell any machines or devices covered by certain other patents."

Mercoid Corporation v. Mid-Continent Co., 320 U.S. 661, 666, 64 S.Ct. 268, 271, 88 L. Ed. 376, "The fact that the patentee has the power to refuse a license does not enable him to enlarge the monopoly of the patent by the expedient of attaching conditions to its use. United States v. Masonite Corporation, supra, 316 U.S. at page 277, 62 S.Ct. at page 1077; 86 L.Ed. 1461. *The method by which the monopoly is sought to be extended is immaterial.* United States v. Univis Lens Co., supra, 316 U.S. at pages 251, 252, 62 S.Ct. at pages 1093, 1094, 86 L.Ed. 1408." (Emphasis supplied.)

■ The public, in a system of free competition, is entitled to have the competition of other devices with a patented device and here it is against that public's interest to use the patent to suppress such competition. As stated by the Supreme Court in the recent case of Transparent–Wrap Mach. Corporation v. Stokes & Smith, 329 U.S. 637, 644, 67 S.Ct. 610, 614: "Protection from competition in the sale of unpatented materials is not granted by either the patent law or the general law. He who uses his patent to obtain protection from competition in the sale of unpatented materials extends by contract his patent monopoly to articles as respects which the law sanctions neither monopolies nor restraints of trade."

We see no merit in the licensee's contention that the Lockwasher case is distinguishable because in that case there were several licensees and here there is but one. As seen, the licensee was a "very large company" doing a business abroad and in the United States, with an income of rentals from the cutter of $212,700 in the year the contract was made, and which had acquired mastery of the entire field of pipe cutting. In Mercoid Corporation v. Mid-Continent Co., 320 U.S. at page 663, 64 S.Ct. at page 270, 88 L.Ed. 376, there was a sole licensee and the license denied the use of other devices with the use of the patent. There the licensee could sublicense, just as here the licensee could sublicense the use of the pipe cutter.

As well could it be said that the principle here invoked would not apply if a patent for making steel was licensed solely to the Steel Corporation and that very large company in the steel business, as the licensee here is in that of pipe cutting, were required to agree not to manufacture, use or sell competing steel making devices.

■ With regard to the licensor's agreement with the licensee to make more certain the licensee's profit by extending the monopoly area by excluding itself from making, using, renting or licensing competitive cutters, such a patent monopoly extension by the *agreement* of the licensor has the same prejudice to the public as the restricting agreement of the licensee. In the recent case of Scott Paper Co. v. Marcalus, 326 U.S. 249, 257, 66 S.Ct. 101, 90 L.Ed. 47, it was held, distinguishing prior decisions, that it is against the public interest for an owner of a claimed patent to make an agreement with his licensee by which he binds himself not to contest the validity of the licensed patent. In the public interest the licensor must not bind himself not to make, use and vend articles covered by the terms of the patent and hence cannot bind himself not to defend such creation of goods on the ground that the patent he has purported to license is invalid because anticipated by a valid but expired patent.

■ With regard to the agreement's compulsion on the patentee not to exercise the inventive power of its general manager and other employees in privity with it, in creating competing devices, the purpose of the patent law is to encourage, not to hamper, invention.

There is no merit to the contention, attempted to be based on United States v. General Electric Co., 272 U.S. 476, 47 S. Ct. 192, 71 L.Ed. 362, that because the patentee may refrain from making or using competing devices, unpatented or patented, he may bind his licensee so to refrain. In Morton Salt Co. v. Suppiger, supra, the Suppiger Co. could have refrained from using any unpatented salt tablets other than its own in its patented machines for the insertion of salt tablets in the process of canning. Yet the court held against public policy the prevention of its licensee, as here, from using tablets competing with Suppiger's. So also in United States v.

Masonite Corporation, 316 U.S. 265, 280, 62 S.Ct. 1070, 86 L.Ed. 1461, where the lower court relying on the General Electric case was reversed. There the Masonite Corporation could have fixed its price on the patented hardboard it sold yet it was held against public policy and a violation of the anti-trust laws to fix the price of the persons licensed to vend the hardboard.

Such restricting conditions are not "reasonably within the reward which the patentee by the grant [or licensing] of the patent is entitled to secure" mentioned in United States v. General Electric Co., supra, 272 U.S. at page 489, 47 S.Ct. at page 196, 71 L.Ed. 362, "As stated by Mr. Justice Story in Pennock v. Dialogue, 2 Pet. 1, 19, 7 L.Ed. 327, the promotion of the progress of science and the useful arts is the 'main object'; reward of inventors is secondary and merely a means to that end. Or, in the words of Mr. Justice Daniel in Kendall v. Winsor, 21 How. 322, 329, 16 L.Ed. 165, 'Whilst the remuneration of genius and useful ingenuity is a duty incumbent upon the public, the rights and welfare of the community must be fairly dealt with and effectually guarded. Considerations of individual emolument can never be permitted to operate to the injury of these.' And see Blount Mfg. Co. v. Yale & Towne Mfg. Co., C.C., 166 F. 555." United States v. Masonite Corporation, 316 U.S. 265, 278, 62 S.Ct. 1070, 1077, 86 L.Ed. 1461.

The licensor and licensee contend that whether or not such discouragement in invention and such suppression of competition of other devices be otherwise against the public interest, they are not prohibited where, as here, the patentee's royalty income is measured, in part, by the profits the licensee makes from its use of the patent—here by one-half the profits secured by a lien on all the licensed devices manufactured by and belonging to the licensee.

■ We do not agree that the evidence supports the lower court's finding that the licensing agreement created a joint venture. The patentee here is not liable for the licensee's losses in exploiting the products of its license. On the contrary, if the licensee become bankrupt, the patentee, with its lien on the bankrupt's manufactured devices, may purchase them for $300 each, any unpaid royalties to apply on the purchase price. The parties were clearly dealing at arm's length. The transaction does not become a joint venture because the *amount* of the royalty is measured in part by the licensee's profits. If the lower court's holding were correct every licensing agreement yielding a profit measured by the success of the exploitation of the patent would be such a venture.

The prior owners of the patent upon which the pipe cutters were made were one Reilly and one Stone. Reilly's and Stone's invention was made while they were employees of the Baash Perforator Co., which thus had a claim on the patent. One Kammerer had a prior patent for pipe cutting, of which it was claimed the Reilly and Stone patent was an infringement, and litigation was threatened. The several parties came together and agreed it would be more profitable not to litigate. In this situation the patentee Kammerer and the patentees Reilly and Stone each could have licensed to the Baash Perforator Co. for a royalty to each and each agreed not to invent or "manufacture, sell or use" etc. any competing device and the Perforator company likewise agreed not to manufacture, sell, use, etc.

Had this been done a similar result to that in the instant case would have been accomplished with three parties acting against the public interest instead of two. That the patentees obtain their royalties as stockholders in the Kammerer Corporation, to which they transferred their patents and of which they became the controlling officers and directors, does not change the prejudice to the public interest. In both methods the restrictive covenants are a convenient method of protecting each from inter-party competition but, as stated by Chief Justice Stone in B. B. Chemical Co. v. Ellis, 314 U.S. 495, 498, 62 S.Ct. 406, 408, 86 L.Ed. 367, "The patent monopoly is not enlarged by reason of the fact that it would be more convenient to the patentee to have it so, or because he cannot avail himself of its benefits within the limits of the grant."

■ Even had this patent licensing contract created a joint venture, the sharing of profits and losses is no ground for protecting them by agreements against the public interest. The case of Universal Sales Corporation v. California etc. Mfg. Co., 20 Cal.2d 751, 128 P.2d 665, cited by appellees, had no agreement restricting the use of competitive materials or in any way affecting the public interest. In the case of Kinsman v. Parkhurst, 18 How. 289, 293, 15 L.Ed. 385, also cited by appellees, the Court held no more than that it was "competent for two persons, being joint owners of letters-patent, whether valid or invalid, to enter into a copartnership for the manufacture and sale of the patented machines, and to stipulate that one of them should alone conduct the business." In that case there was no question of the licenses reaching beyond the patented articles and discouraging other patenting or forbidding the use of competitive devices. If the Court's statement "Besides, if the contract to refrain from the manufacture could not be enforced, as being against public policy, this would afford no answer to a claim for an account of profits actually realized by prosecuting the business, there being no connection between the illegal stipulation and the profits of the business," means that the Court will enforce such a contract, as here, affecting the public interest if there is no connection between the public injury and the profits from pipe cutting—it is overruled by many subsequent decisions such as Morton Salt Co. v. Suppiger & Co., supra, 314 U.S. at page 494, 62 S.Ct. at page 406, 86 L.Ed. 363, where it is stated, "It is the adverse effect upon the public interest of a successful infringement suit in conjunction with the patentee's course of conduct which disqualifies him to maintain the suit, regardless of whether the particular defendant has suffered from the misuse of the patent."

■ McCullough also claims the contract gives the licensee the right only to "manufacture and use" the patented device. Hence, it is contended, the device cannot be rented to others and its use solely by the licensee required the employment of skilled workmen. The license, he claims, fixes the price the licensee may charge the oil drillers it serves at $190 per use, thus controlling not the mere participation price of the value of the tool in making the cut but, as well, the price charged the parties served for the workmen employed.

We do not agree that the contract so provides. At one place it grants "the exclusive right to manufacture and use, but not sell" the cutters. However, it later provides for part of the royalty, one-half the gross earnings from "the *use* of said devices by the licensee" and just after that for the payment of $190 per cut for the *"rental for the use"* of the cutters. It next provides that the licensee shall keep books of account showing "the names of the parties to whom the same [cutters] were *rented or* upon whose property the same are *used*." It then provides for a monthly "statement showing the dates of the use *or* rental thereof and the *number of cuts made* and the parties for whom the device or devices were *used* during the preceding calendar month."

■ We construe this contract to mean that where there was a rental of the use of the cutter to an oil driller, the $190 received was part of the licensee's gross earnings to be divided equally with the licensor. Where the licensee itself used the device on the property whose oil wells it served, the charges for the services and use were additions to the gross earnings to be equally divided. We can see no public harm in such an agreement.

We hold that the evidence establishes that the licensing contract and the operations thereunder substantially prejudiced the public interest in that they stifled new competitive invention and suppressed competitive forces which stimulate newer and better products, and that the contract's covenants strike at the very purpose of the statute and its constitutional basis. Neither the Kammerer Corporation nor the Baash-Ross Tool Company is entitled to damages for McCullough infringement and the interlocutory judgment for damages and an accounting is reversed and the complaints are ordered dismissed.

Reversed.

BONE, Circuit Judge (dissenting).

In United States v. General Electric Co., 272 U.S. 478, 489, 490, 47 S.Ct. 192, 196, 197, 71 L.Ed. 362, a unanimous Court announced a basic rule clearly applicable to the license agreement in the case at bar and later cases do not appear to have diluted or modified that rule. The Court there said: "The patentee may grant a license to· make, use, and vend articles under the specifications of his patent for any royalty, *or upon any condition the performance of which* [condition] *is reasonably within the reward which the patentee by the grant of the patent is entitled to secure.*" (Emphasis supplied.)

Also: "The patentee may make and grant a license to another to make *and use* the patented articles *but withhold his right to sell them.* \* \* \* if he [the licensee] *sells* them he infringes *the right* of the patentee, and may be held for damages and enjoined." (Emphasis supplied.) The Court goes even further in this case in declaring that *if* the patentee licenses *the selling* of the articles, he may limit the selling *by limiting the method of sale.* See also comments of a unanimous Court on powers of a patent licensor set forth in first complete paragraph, Ethyl Gasoline Corporation v. United States, 309 U.S. 436, on page 456, 60 S.Ct. 618 on page 625, 84 L.Ed. 852.

In the General Electric case the Court is speaking about, and passing upon, the dominant issue squarely confronting this court in the case at bar; that issue is "the performance" (by a licensee) of a "condition" prescribed in a license agreement. The inescapable logic of its pronouncement upon that aspect of patent law is that *if* the patentee himself may lawfully do the things sanctioned and authorized by our patent laws, he may (within the limits noted by the court, which "limits" were not transcended by the licensee in the instant case) lawfully grant a patent license which confers upon the licensee the lawful right to engage in precisely the same sort of operations. A license agreement, thus conditioned, does not expand or escape the orbit of the patent and/or the rights which inure to the patentee under his patent grant.

If the General Electric case is still "good law" why doubt the absolute *right* of Kammerer to do everything the Baash Company was authorized to do under the instant agreement. In my view of the law of this case, these "authorizations" are, in legal contemplation, but a mere recitation of business operations which licensor Kammerer, if operating alone, could lawfully "perform." This view appears to find adequate support in the doctrine announced in the General Electric case, and sanction in the very nature of our contract and patent law. If a patent owner prefers to refrain entirely from exploiting his own patent, as for example by doing and performing the very acts and things which Kammerer authorized Baash to do, but elects to confer upon a licensee the exclusive right to do and perform these acts and practices, I am unable to see how such practices by a licensee are thereby translated into legal villainies merely because they are permitted by the license agreement. Furthermore, if Kammerer had preferred to manufacture its own device and not make any patent licenses, and thereafter proceeded to do the very same things this agreement purports to authorize Baash to do, the royalty (or rental) payments collected by Kammerer would be *"reasonably within the reward"* which the patent grant *entitled Kammerer to secure.*

A license limiting *the use* of a patented wringer and gear mechanism to certain types of washing machines is a valid exercise of the patent monopoly. Vulcan Mfg. Co. v. Maytag, 8 Cir., 73 F.2d 136, certiorari dismissed, 294 U.S. 734, 55 S.Ct. 403, 79 L.Ed. 1263.

To avoid irrelevancies it is well at the outset to point out some of the basic conclusions upon which this court rests its opinion in this case. It says:

(1) "These covenants [paragraphs 11 and 12 of the license agreement] *extend the monopoly* of the patent *by* preventing competition with the patent of any other pipe cutter \* \* \* used or sold by the *licensee*". (Emphasis supplied.)

Also:

(2) "The *licensor* to procure such extension of the monopoly area of its patent

* * * binds itself to extend the area of the monopoly by a similar restrictive agreement." (Emphasis supplied.)

Also:

(3) " * * * the patentee [Kammerer] is a corporaion having as its general manager an inventor of pipe cutters as well as two of its officers also such inventors. Its agreement to extend the patent monopoly by eliminating competition is aided by its agreement not to avail itself of the inventive genius of its employees in creating competitive devices which it can 'manufacture, sell, rent, license, use or in any way do business with.' "

The first two contentions advanced seem to me to beg the question baldly posed by this case. I prefer to suggest the answer in the general comments in this dissent. As to the third, I think that it finds a satisfactory answer in the very language of the two (cited) paragraphs of the license agreement. Paragraph 12 of the license agreement says in simple English that Kammerer agrees not to "manufacture, sell, rent, license, use or * * * do business" (with the covered device) "or with devices which will come or be in competition with the device or devices covered by the agreement." The plain purpose of this language was to permit Baash to (thereafter) exclusively use the Kammerer device, i. e., to "do business" with it. Kammerer simply agreed that it would not "do business" with its own device but preferred to yield the field of use to Baash. This is not a suppression of use. On the contrary, the agreement called for free use by Baash of the patented device in an important field of business activity.

Since this mindless creature of the law (a corporation) can hardly be charged with the offense of violating public policy by agreeing that it will not invent something, my associates turn to its employees and charge that Kammerer agreed not to avail itself of the inventive genius of its employees in creating competitive devices.

The language I have quoted above fully answers this unnatural construction of the meaning of the plain provision of Paragraph 12. On its face the license agreement shows that all of the individuals connected with the Kammerer and Baash organizations were left free to invent anything and to freely sell their inventions to any one. The language of the agreement can not be tortured into a "discouragement in invention." Our opinion is literally a holding that Kammerer was party to an agreement which "stifled invention"—but whose invention did it "stifle"? Certainly the patented device of Kammerer was not (thereby) being stifled —it was being put to the freest sort of use in eleven states. Our opinion accents the fact of what it calls "large operations" by Baash in exploiting the Kammerer patent.

Paragraph 11 applying to the licensee is equally void of language suggestive of such repression of "invention," or of the "inventive instinct." As indicated, all agents, officers and employees of both licensor and licensee were left entirely free (under the language of the agreement) to invent and give full play to their inventive instincts (and sell their invention or inventions).

Appellant makes certain specific contentions in his brief which aid materially to narrow the legal issue before us. He says: "Our contention is simply this: that, * * * the parties to a patent license agreement may not disable both of them from selling the patented invention. We believe that such a restraint, created by agreement, * * * is unlawful." (Emphasis supplied.) This contention is both simple and blunt and permits 'of no misunderstanding of what we are forced to decide. If our opinion gives sanction to it, we part company with the doctrine of the General Electric case, which holds that the patent licensor may [272 U.S. 478, 47 S.Ct. 197] "withhold his right to sell." Within the orbit of the patent, the patent owner may lawfully license such part of his rights as he chooses. Where in the law do we find sanction for the doctrine that the patent licensor loses this right to withhold some part of his rights, merely because he exercises a recognized legal right to grant a patent license?

The law does not compel a patent owner to sell his patent. Aside from entering into contracts not to use an invention,

which are a restraint of trade, the patent owner may refrain from doing anything at all with his patent—its validity is not affected by his non-use. Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122.

Another contention by appellant is that the *use* of the patented device (by a licensee) may not lawfully be restricted ("conditioned") in the license. The General Electric case also answers that contention. Kammerer could lawfully make, *use* and vend its patented device, and exclude all others from such operations. Or it could part company (by a license) with a *part* of these exclusive rights and authorize a licensee to *use* the licensed device "upon *any condition the performance of which* is reasonably within the reward" which Kammerer is entitled to secure. That "reward" would most certainly be a lawful one when it came in the form of "rentals" received for the use of the patented device.[1]

By the license to Baash, the Kammerer corporation simply agreed that its "reward" should be provided in a percentage of the rentals received by Baash for the use of the Kammerer tool. Our opinion makes an unprofitable argument on the issue raised in the case as to whether the agreement established a "joint venture" between appellees. I wholly agree with appellant who states in his Reply Brief that he believes that this particular question "is irrelevant to the fundamental question" in the case. It is. Furthermore, I see nothing illegal in in this way of *securing a reward* to the patent owner.

It is a significant and interesting fact that no case has been cited to us which is "on all fours" with the case at bar. So in order to plaster this license agreement with badges of illegality, said to clearly appear on its face, this court turns to and lifts quotations from cases dealing with totally different states of fact. Employing this process of analogy, it concludes that the instant agreement, per se, is legal proof that the parties thereto deliberately contracted and agreed to engage in the activities, and commit the various legal sins, found to be present, and constituting the dominant legal issue in, such cases as Mercoid Corporation v. Mid-Continent Inv. Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376; Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363; National Lockwasher Co. v. George K. Garrett Co., 3 Cir., 137 F.2d 255; Pope Mfg. Co. v. Gormully, 144 U.S. 224, 12 S.Ct. 632, 36 L.Ed. 414; Transparent-Wrap Machine Corporation v. Stokes & Smith Co., 329 U.S. 637, 67 S.Ct. 610; Carbice Corporation v. American Patents Development Corporation, 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819; United

---

[1] Another contention further revealing the real basis of appellant's case is as follows: "Where the patent owner, as here, attaches to its license agreement any terms or conditions whereby the licensee is obliged not to do something which it [licensee] would have a free right to do, but for the license, it is evident that the restraint on the licensee is outside the patent monopoly and results from the agreement. The fact [here relying on the Mercoid case] that the patentee has the power to refuse a license does not enable him [patentee] to enlarge the monopoly of the patent by the expedient of attaching conditions to its use."

The foregoing argument of appellant cannot be sustained (on the theory that the restraint on Baash "enlarges" the monopoly of the Kammerer patent) unless this court completely ignores the holding in the General Electric case which is absolutely to the contrary.

McCullough insists that the license agreement in this case is objectionable, when measured by the Mercoid case, even though the royalty in that case was based on an unpatented part.

One of the major complaints of appellant in this case is that the license agreement is illegal because Kammerer and Baash never sold the patented tool. Cases condemning price restrictions and/or resale prices are not applicable here.

The system of renting the use of "fishing tools" when they are needed has long been the recognized method by which oil well drilling operators have economically availed themselves of the use of sundry "fishing tools"—a practice which made it unnecessary for these drillers to purchase a large stock of various sized tools which would probably be very expensive. Appellees maintained a service operation and a corps of expert operators who could take care of emergency requirements of the oil industry at any time, day or night.

States v. Masonite Corporation, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461.

This oblique process undertakes to prove too much. The facts and the real legal issue in this case are poles apart from those in the cases just referred to, some of which are relied upon in the court's opinion.[2] It does not provide an answer in this case to lift broad statements of general principles from cases dealing directly and specifically with "tie-in" operations and bald attempts to achieve a limited monopoly of unpatented materials, and by analogy make them apply to the limited, peculiar and wholly different facts of this case. The law and the facts in those cases cannot and should not be made into a drag-net which sweeps this case into their various orbits.

I agree with the experienced trial judge in this case whose findings were that the challenged license provisions were lawful ones; that they were not designed and fashioned to accomplish unlawful purposes, and that under them, the parties did not accomplish, or attempt to accomplish, unlawful purposes. I agree with him that the agreement did not authorize or purport to authorize monopolistic practices which transcend the orbit and scope of the Kammerer patent and the permissible range of "rights" which may lawfully be exercised by the parties to such a patent license.

Other practical matters deserve attention. Kammerer did not "withdraw" from "competition" in its "field." The admitted fact is before us that Kammerer never had a field of operations and it never competed, or attempted to compete with any one. It was apparently a "paper corporation" expressly created for the one and only purpose of holding the Kammerer patent or patents here involved — it was not, and never was, a manufacturing and/or selling company.

Another aspect of this case presents itself. For all this court knows, there may have been dozens of (patented and unpatented) pipe cutting devices on the market all available to oil well operators all over the world. That this is assumed by the court appears from its conclusion that competitors of the Kammerer tool[?] were "discouraged" because the Kammerer tool had supplanted these competitive tools in general use.

Such considerations suggest pertinent inquiries. How does this agreement, *on its face,* purge, or tend to purge, the market of all such competing devices (as in the Lockwasher case, supra)? Where in the contract are the provisions, which in themselves, would actually create an unlawful monopoly in a business field? The court postulates the existence of an illegal "monopoly" by an inference arising solely from the face of the agreement—not from the evidence in the case. It has to *assume* the existence of *some* competition which was illegally restrained and/or suppressed by means of the Kammerer-Baash agreement. If actual or potential competition was not restrained or suppressed by the Kammerer-Baash agreement, why strike down the agreement? Actual legal restraint or suppression of competition, as a *fact* in this case, has not been established by evidence. For some reason which I think lacks pertinence, my associates stress the fact that the licensee was described as "a very large company." In one year it did a service business of $212,700 in eleven states, or an average collection of approximately $19,272 from users of its tool in each of these eleven states. If this is thought to be persuasive of anything, the answer is that unless the facts in this case demonstrate that appellees were operating outside the four corners of our patent and antitrust laws in the securing and enjoyment of this service business, the size of their business is without legal significance, as I shall endeavor to demonstrate in this dissent.

In its opinion the court comments on one finding of the trial court in the former injunction hearing in this action where the issue presented was that of patent infringement by appellant with an added claim by appellees for damages and an accounting. Speaking of this finding this court says: "The district court found * * * that the licensee had a monopoly of the field

[2] Scott Paper Co. v. Marcalus Co., 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47, is cited as supporting the views expressed in the prevailing opinion. Its bearing upon the issue we face is not apparent.

of pipe cutting in the United States, all other cutters being supplanted by the cutter of which it had the patent monopoly."

To the foregoing comment this court adds: "Nothing could more *discourage inventors or manufacturers of better competitive cutters* than *to take from them* the patronage of the only person then using or cutting with the only device used in cutting broken pipe in all the oil fields * * *." (Emphasis supplied.)

There is nothing in the foregoing comments of the court which demonstrates in any manner that the *size* of appellees' pipe cutting operations was illegal per se, or was the result of illegal practices of appellees which restrained or suppressed competition. Therefore, I conclude that the court is of the view that appellees, as a matter of law became authors and operators of an illegal monopoly merely because their superior tool was so popular with users of such a device that they refused to use other cutters.

The court lays emphasis on the fact that *inventors or manufacturers of* (other) *better competitive cutters* became *discouraged* over this competitive situation since it served *to take from them* the patronage of persons using such devices. What is legally or morally wrong in acquiring business *in great volume* if the *process of acquisition* is wholly within the law? Since when has popularity of a product become a crime? In this case, the large volume of business flowing to appellees may have "discouraged" the "inventors or manufacturers of better competitive cutters," but this was the natural and inevitable result of offering a superior tool to users. How does the "discouragement" of these competitors, arising from their inability to retain trade going to a superior product, become a violation of law or involve any aspect of "public policy"?

There is a queer absence of realism in the court's conclusion despite its reliance on the finding of the district court in the infringement action. In that action the court found:

"There is nothing in the prior art akin to the manner in which the elements are combined in the patent in suit. The out-side cutters of the Reilly and Stone Patent No. 1,625,391 is a tool which has, with great commerical success over a long period of years, produced a better result and has achieved results not attained by any prior device know to the art.

"That since the introduction of the device of the patent in suit to the oil industry by plaintiff, Baash-Ross Tool Company, and its predecessor in interest, L. F. Baash Perforating Company, said device has displaced all prior devices in cutting and removing frozen or stuck drill pipe and tubing from wells."

It is in the second of these findings that my associates find such gloomy significance, but all that can possibly be tortured or squeezed out of its language is the conclusion that (despite the "better competitive cutters") the superior Kammerer tool so captured public approval that it supplanted and displaced what the using public must have regarded as inferior devices being offered. On the face of the whole record in this case, that is exactly what happened, and such an achievement does not violate either the letter or the spirit of our patent laws. These laws do not deprive men of the right freely to select the things they prefer to use. If we hold that this is the effect of these laws, the results on business in this circuit would be unpredictable. If national advertisers who spend millions of dollars in various forms of advertising to secure universal use of their products (protected by patents or trademarks) succeeded in securing such use by those lawful methods, we would, under the doctrine we announce, be forced to declare them law violators despite the wish and election of the buying public exclusively to use such products.

For the reason just stated, I am unwilling to translate such a legal and perfectly understandable capture of the pipe cutting business by a superior tool into an illegal operation which threatens "public intrest". Is it the view of the court that it possesses the power to *compel* oil well operators to use or prefer an inferior device, or that it should try to force inferior and unwanted devices into a favorable competitive position with a superior product? Does it conclude

that it *must* deprive appellees of a legal right to an accounting for damages due to infringement, merely because the infringing appellant or others unnamed could not successfully compete with the superior Kammerer tool? Yet that seems to be the objective of the decision in this case.

Our decision says that "the contention is entirely irrelevant that neither party was harmed by the agreement." For reasons I indicate in this dissent I think that absence of *harm* to appellant from the existence of, and operations under, the license agreement, is a matter of supreme importance in this case. The court passes to an issue which I think is not in this case — the issue of "public interest" and makes the decision turn on that point. It reads into the term "public interest" a new and very astounding meaning. It concludes that the sweeping popularity of the Kammerer tool and its claimed universal and *voluntary* use by oil well men is a form of "monopoly" which, ipso facto, is against "public interest;" because these oil well men *refused* to use other devices, this free and very normal expression of *their* preference for a superior tool, outrages "public interest." No case is cited which sustains this astounding theory and a sense of humor, if nothing else, should remind us of the truth of the old saw about a pathway being beaten to the door of the man who invents a better mouse trap.

The patented tool of appellees did not deprive either the public or appellant of anything they enjoyed prior to its invention. It gave something of value to the community by adding to the sum of human knowledge. It embodied elements (recognized by courts passing on the validity of the patent) entirely unknown to the prior art. Small wonder that oil well operators immediately put it into general use since it provided a satisfactory solution of their vexing mechanical problems.

But this court sees in this universal popularity and wide use of a new and efficient tool, a sinister attack upon "public interest". It refuses to recognize that this popularity and wide use was a perfectly logical (and legal) reward for inventing a superior and efficient device theretofore unknown in its field of use. The widespread and *voluntary* use by oil well operators seems to mean nothing to the court — it blinds itself to the obvious fact that the only kind of "public interest" involved in this case was that shown by men seeking a better pipe cutting tool. They found it in the Kammerer tool.

The evidence we face completely fails to demonstrate that (1) the *practices* of appellees contravened public interest, (2) stifled new competitive invention, (3) suppressed competitive forces which stimulate newer and better products. Since appellant demands that we deny to appellees the relief they seek in this court because their damage claim is tainted with illegality, it is in order to demonstrate by the record that appellees did not "stifle" or "discourage" any real inventive genius of appellant. Reference in the court's opinion to others whose inventive genius may have been "stifled," is too vague to justify comment.) Appellees did not harm him; he was the author of his own business misfortunes and we should not charge them to appellees by a process of indirection.

How appellant worked his own undoing is an interesting story and it is accurately reported in the opinion and findings of the trial court on the original infringement suit. One finding (now binding on this court) reads as follows: "Defendant, Ira J. McCullough, acquired his knowledge of outside cutters while in the employ of plaintiff, Baash-Ross Tool Company. Defendant left the employ of Baash-Ross Tool Company and commenced working on outside cutters and applied for United States Letters Patent thereon. Defendant knew the Reilly and Stone Patent in suit when he designed and made outside pipe cutters like the devices shown in Defendant's Exhibit C., and Defendant's Exhibit D. Both of these devices have all of the elements of the combination in the same cooperative relationship, and accomplish the same result in the same way as does the device of the patent in suit."

In its Opinion in that case the trial court said:

"* * * The background of the defendant, Ira J. McCullough, shows the

acquisition of knowledge in the art in the employ of one of the plaintiffs, the Baash-Ross Tool Company. The device manufactured is, in all respects, similar to the device of the plaintiffs.

\* \* \* \* \* \*

"\* \* \* The defendant, Ira J. McCullough, having learned the art in the employ of one of the plaintiffs, who manufactured this device for many years, both under the patent in suit and the Kammerer patents, cannot escape the penalties of infringement by manufacturing, according to the teachings of the patent, a device which, while containing all the elements of the claims in suit, operates in a manner which, although not used by the plaintiffs in their device, is claimed and taught by the patent."

So it plainly appears that appellant did not exercise his "inventive genius" — he did not stoutly resist wicked efforts of appellees to crush some "competitive force" within him which might have inspired and stimulated him to invent a tool far superior to the Kammerer tool. On the contrary he busied himself in the work of preserving and promoting his own special brand of "free enterprise" by calmly appropriating another man's original and patented idea.

No wonder the court hastens to assure us that the fact that "neither party was harmed" by the Kammerer-Baash license agreement is "irrelevant." On this record it faced an impossible task in trying to show that appellees had harmed appellant. The shoe was on the other foot. I suggest that "public interest" would have been served in an admirable manner had appellant found in the Kammerer tool a great inspiration to invent a much superior device and then succeeded in doing it. In that event he would surely have placed himself firmly in the favorable business position occupied by appellees. I resist the temptation to speculate on what our attitude might be if that sort of a reversed situation had developed and appellant's present contentions were then presented to us by appellees.

At this point I emphasize the fact that the cases cited in the court's opinion do not justify the conclusion it reaches. One of these is Pope v. Gormully, supra, which was characterized by the court as "rare and unique," and difficult to assign to a proper place among legal obligations. Obligations there imposed upon a licensee appear to have been projected beyond the term of the license. The court narrowed the justiciable issue by this language [144 U.S. 224, 12 S. Ct. 636]: "\* \* \* the *real question* is whether the defendant [licensee] can estop himself from disputing patents which may be wholly void, or to which the plaintiff [licensor] may have no shadow of title." In this case the court was considering *an abuse of the licensee* — a situation not factually or legally comparable to, or even claimed to exist, in the case at bar. While some language is dredged up from the Pope case to justify this court's opinion, the Court there was dealing with a license agreement (declared to be) *so oppressive to the licensee* that a court of equity was justified in refusing relief to the licensor plaintiff. The Court indicated that the agreement would probably foreclose the licensee from ability to earn an honest living in his chosen calling. Much of the Court's comment deals with *fundamental rights of a licensee* which, as a matter of public policy, may not lawfully be bartered away. The case did not decide the issue we face and its force as authority is not apparent.

The logic of the Blount case, 1909, C.C., 166 F. 555 does not weaken appellees' case. There two manufacturers, each with a patented invention, agreed not to compete — a factual situation absent in the case at bar. It lacks pertinence in a case such as we face. The issues we confront are within the orbit of the General Electric case. See Daniels v. Brown Shoe Co., 77 F.2d 899 and Bement & Sons v. National Harrow Co., 186 U.S. 70, 22 S.Ct. 747, 46 L.Ed. 1058.

The distinction between the *facts* in this case and those in the Lockwasher case, supra, is very marked. That case involved a contractual combination embracing at least six manufacturing concerns all coldly bent upon the creation of a stifling monopoly in an entire field which (under the facts disclosed at trial) *was deliberately fashioned and designed to purge the entire market of competition.* No such design, purpose, ability or attempt to monopolize

and to "purge" the market of *all or any competitors* was shown in this case. Here the findings of the trial court indicate the exact contrary to be true. In fact, the findings and conclusions (supported by the evidence) repel the charge and the conclusion that the business operations of appellees were monopolistic in character, or were designed to, or achieved results of that nature.

It is easy to marshal an imposing array of cases which proclaim the mournful fact that the "monopoly" of the patent grant was abused by business practices shown in those cases. The cases cited by the instant opinion generally fall into this category. I think that they lend no weight to the conclusion we reach since they deal with *factual situations not even distantly* related to the facts in this case. In the instant case, the facts are shunted into the de minimis class. I think that it will be found that in practically all of these cases, the courts immediately came to grips with the facts, and the logic of this sort of approach is apparent. One excellent reason lies in the fact that no rule has yet been devised by the wit of courts which could be applied to all factual situations. Obviously this calls for a careful delineation of the facts against which even a well recognized rule should be applied.

In the instant case appellees first vigorously denied that their agreement reveals an intent to project their business *practices* beyond the lawful orbit of the patent grant, a contention I approve and to which the trial court agreed after a full hearing on the merits. The trial court also inquired into the *practices* of appellees under their agreement and determined that these did not circumvent anti-trust and/or patent laws.

This courts says that the language in two or more provisions of the Kammerer-Baash license agreement is sufficient in itself to void the agreement as "contrary to public policy." Our opinion portrays "public policy" as a legal principle which necessarily calls for condemnation of the license agreement despite the absence of proof therein that the business *practices* of appellees harmed the business *practices* of appellant. This sort of condemnation, without any showing of actual injury, resulting from illegal *practices,* is a novel application of a wholesome principle of law designed by society to prevent the doing of legal *injury* to others.

Since reference has been made to the findings of the trial court, I call attention to the fact that our court rules require that specifications of error in findings and conclusions "shall state" wherein they are alleged to be erroneous. Appellant presents no such specifications of error nor does he make reference to the findings in the statement of points he relies upon. All we have from appellant is the (here summarized) assertion that the district court erred: (1) in holding that license agreement does not contain restrictive covenants which are against public policy, in restraint of trade and illegal; (2) in holding that plaintiffs are not barred from using a court of equity to enforce the patent grant; (3) in holding that plaintiffs are entitled to an accounting and a recovery of profits and damages; and (4) in denying all plaintiff's motions and entering the Order of June 5, 1945 appealed from herein. On the record before us McCullough does not attack the findings as being erroneous or contrary to or not fully supported by the record.

The trial court correctly disposed of the issues presented on the accounting and its judgment should be affirmed.