## F. C. RUSSELL CO. v. COMFORT EQUIPMENT CORP.

### No. 10407.

United States Court of Appeals Seventh Circuit.

March 4, 1952.

William C. McCoy, John F. Pearne, William C. McCoy, Jr., and Evans & McCoy, all of Cleveland, Ohio, George N. Hibben, Chicago, Ill., for appellant.

Casper W. Ooms, Chicago, Ill., Henry N. Paul, Jr., Philadelphia, Pa., Owen J. Ooms, Chicago, Ill., for appellee.

Before MAJOR, Chief Judge, and DUFFY and FINNEGAN, Circuit Judges.

FINNEGAN, Circuit Judge.

The plaintiff below, the F. C. Russell Company, appeals from a judgment order of the United States District Court for the Northern District of Illinois, Eastern Division, which dismissed its complaint charging Comfort Equipment Corporation with infringement of Ensminger patent No. 2,262,670, and seeking injunctive and accounting relief.

In its answer Comfort Equipment Corporation denies infringement. It also urges invalidity for lack of invention over the prior art, and charges misuse by plaintiff-appellant of the patent in suit.

The District Court held the patent invalid as it represents a mere congregation of elements which perform no new function or result in assembly; that, if valid, claims 3 and 10 of the patent would be infringed by defendant's structure; and that Russell must be denied all relief because it has misused its patent. The opinion of the District Court, 97 F.Supp. 784, 785, reviews the pertinent facts and principles of the law that impelled that court to dismiss the case.

The patent involved is for a combination storm and screen window. One of the objects of the patentee was to provide a combination which might be permanently installed and so constructed as to readily permit the removal, from within the building, of glass panels used in the winter season and the insertion in lieu thereof of screen panels for summer use. A further object was to provide an arrangement which would permit installation of a single stand-

ard size factory-made rigid frame that could be made to fit a range of sizes of window openings, such as distorted or out-of-square openings, and which, after installation, would be self-adjustable to the distortion, expansion, or contraction of the window aperture.

The structure of the patent in suit is an arrangement or combination of three elements: 1st—a rigid panel receiving frame for receiving glass and screen panels; 2nd—channel shaped sealing members which embrace the sides of the rigid panel frame; and 3rd—means for holding the sealing members in place against the walls of the window aperture, and for applying a clamping pressure to the flanges of the sealing member in order to hold the panel receiving frame in fixed position with respect to the sealing members.

The trial court found that the different elements of the plaintiff-appellant structure function in relation to each other in the following manner:

"The panel receiving frame is embraced by the resilient flanges of the sealing channels, with the inturned edges of the sealing channels, both during and after installation, slidably and frictionally engaging the opposite, flat, inner and outer faces of the panel receiving frame with a yielding pressure.

"The screw secures the sealing channel(s) in place against the sides of the window casing and the blind stop in tight sealing relation with both, and also has clamping effect on the sealing channel to increase the grip of its flanges on the frame.

"The frame is thus mounted in the window aperture by frictional clamping engagement with the flanges of the sealing channel which sealing channel in turn is permanently, positively and securely mounted in the window aperture by the screws. The panel receiving frame has connection with the window aperture only by way of the red sealing channel and thus 'floats' within the channel.

"Each of the elements cooperates with each of the other elements in producing this functional relationship between them."

Claims 3 and 10 of the patent are alleged to be infringed—they are as follows:

Claim 3. "A storm sash for mounting in a window aperture of a building comprising, a panel receiving frame having rigidly connected side and transverse hollow metal bars provided with flat inner and outer side faces, side and transverse sealing members mounted on side and transverse bars of said frame, each sealing member being formed of sheet metal and of channel shape, having a base portion adapted to engage a wall of a building aperture and resilient flanges having inturned edge portions slidably engaging the inner and outer flat faces of the frame bars, each sealing member extending the full length of frame bar upon which it is mounted, one sealing member slidably receiving the end of another at corners of the frame, whereby the sealing members are independently adjustable sidewise and angularly in the plane of the panel receiving frame to seat upon the walls of a building aperture, and means for holding said sealing members in place against the walls of the window aperture and for applying a clamping pressure to the flanges of the sealing members to hold the panel receiving frame in fixed position with respect to the sealing members."

Claim 10. "A structure of the character described for mounting across a building aperture comprising a panel receiving frame including rigidly connected side and transverse frame members, channel shaped sealing members embracing portions of the frame members and having spaced flanges slidable over opposite faces of the frame members for tilting and bodily movement of the sealing members relative to the frame members in adjusting the structure to apertures of different sizes and shapes, and means extending through the flanges of the sealing members for securing the structure in place and for drawing the flanges together to clamp the frame members therebetween."

Speaking through Mr. Justice Jackson, the Supreme Court, in Great Atlantic & Pacific Tea Co. v. Supermarket Corp., 340 U.S. 147, said on pages 152–153, 71 S.Ct. 127, at page 130, 95 L.Ed. 162: "Courts

should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly."

The trial court in the case at bar has carefully scrutinized the claims of the patent in suit in order to determine whether or not the aggregation or conjunction of the old elements produces a new or different function than that theretofore produced by them.

As to the first element, that is to say, a rigid panel frame designed to receive interchangeable glass or screen panels, the court found:

"Combination storm windows consisting of a rigid frame with interchangeable glass and screen panels which can be removed from inside a room are prior art to the patent in suit. They were found in both wooden windows and in metal combination storm windows having interchangeable glass and screen panels before Ensminger filed the application for the patent in suit. The metal combination storm windows are shown in the following United States Letters Patent: No. 1,287,409 issued to Paige in 1918; No. 2,013,824 issued to Ensminger in 1935; and No. 2,156,964 issued to Biddle in 1939."

As to the second element, namely, channel-shaped sealing members which embrace the sides of the rigid panel frame, the trial court found:

"Long before the patent in suit was applied for it was old to use channel or U-shaped members to receive the edges of panel units in buildings so that the panels did not have to be snugly fitted to the opening in which they were mounted but could be made with a certain tolerance or 'sloppy fit' which was concealed when the panel member was inserted in the channels.

"Sweet's Architectural Catalogues of 1930 show panels of various kinds fitting into U-shaped channels. A patent to Beard, No. 567,214 (1896) shows the use of U-shaped channels for mounting screens and is addressed particularly to the problem of making the screens fit into window frames of different sizes. A patent No. 1,583,972, to Holaday (1924) shows the use of a U-shaped channel mounted on a screen door to permit adjustability of the screen door to different size openings. A patent to Ebert, No. 1,795,715 (1931) shows the frame members of a screen with a channel or U-shaped member which can be telescoped about the screen frame to permit the screen to be fitted into windows of different sizes. Similarly, patents to Carroll, No. 1,189,790 (1916), and Cook, No. 1,632,022 (1927), show the same principle. Paige, No. 1,287,409, shows closure channels, generally U-shaped, which receive interchangeable screen and glass panels. It differs from Ensminger (the patent in suit) in that one of the legs of the U is designed to be applied against the wooden frame instead of having the base of the U applied to the wooden frame as shown in the patent in suit."

In reference to the third element, the trial court found that: "The screws referred to in Claim 3 as 'means for holding said sealing members in place against the walls of the window aperture and for applying a clamping pressure to the flange of the sealing members to hold the panel receiving frame in fixed position with respect to the sealing members,' and again referred to in claim 10, as 'means extending through the flanges of the sealing members for securing the structure in place and for drawing the flanges together, * * *' do what ordinary screws have always done, that is secure one member to another and draw members together."

The trial court, after its scrutiny of the elements united in the plaintiff's structure, concluded that: "The assembly of these elements resulted in no new function or operation. Each element performs and has the same function and operation in the assembly that it had separately. Plaintiff's patent is wanting in any unusual or surprising consequences from the unification of the elements. Plaintiff's patent, therefore, does not rise to the dignity of patentable invention."

Compare Lincoln Engineering Company of Illinois v. Stewart-Warner Corp., 303 U.S. 545–549, 58 S.Ct. 662, 82 L.Ed. 1008; Great Atlantic & Pacific Tea Co. v. Supermarket Corporation, 340 U.S. 147–151, 71 S.Ct. 127, 95 L.Ed. 162.

In our opinion the findings and conclusions of the lower court are amply supported by substantial evidence. Ensminger patent No. 2,262,670 fails to meet the "severe" test proposed in the Great Atlantic & Pacific v. Supermarket case. It was properly held invalid.

Since the patent is held invalid, we regard it as unnecessary at this time to review the trial court's finding that defendant's accused structure infringes claims 3 and 10 of the Ensminger patent if valid.

On the issue of "misuse" the trial court found from competent evidence in the record:

"Plaintiff is the largest manufacturer in the United States of combination storm windows, its sales amounting to almost ten per cent of the total sales in this field. It has sold more than five million units under the patent. Plaintiff has also built up one of the largest distributor organizations in combination storm windows in the United States. The distributors are permitted and some have set up dealer organizations under uniform dealer agreements supplied by plaintiff to resell the windows.

"Plaintiff sells the combination storm windows made under the patent to its distributors under uniform agreements called 'Sales and Purchase Agreement.' Provision is also made in these agreements to supply 'knock-down' units or parts of the combination storm windows for assembly by the distributors. Also pursuant to these agreements, suggested uniform dealer-distributor agreements are furnished by plaintiff.

"Pertinent provisions of these uniform 'Sales and Purchase Agreements' are: Article IV. 'Second Party shall at all times during the life of this agreement use its best efforts to promote the sales within the aforesaid territroy. It will, at all times, display in its salesroom or office, suitable samples and displays of said windows for sales demonstration purposes. Second Party further agrees to maintain an adequate sales organization devoted exclusively to the sale of said windows, and further agrees not to merchandise or offer for sale any merchandise which would be competitive with any articles, items or merchandise manufactured and/or distributed by the First Party, without the written approval of First Party.

"The pertinent provision of the dealer-distributor agreements provides:

Paragraph 2. 'Dealer hereby accepts the franchise and agrees to make all sales hereunder in accordance with this agreement. Dealer further agrees to work and develop the aforementioned territory to the satisfaction of distributor, and not to sell any other storm windows.'

"These provisions constitute a misuse of plaintiff's patent. Each of these requirements separately constitutes a misuse of the patent in suit."

The trial court concluded that these provisions of the dealer and distributor agreements would disentitle plaintiff to relief even if the Ensminger patent involved were valid, relying on Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363; and Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376.

Appellant insists that the law of misuse of patents applies only in cases where the patent has been used as an instrument for restricting or promoting the manufacture, use or sale of things other than the patented

invention. It claims that none of the agreements involved in the charge of misuse is a true patent license. It urges: "in every case cited by the defendant where misuse of the patent has been found, the patent itself was used in some way to suppress competition. * * * Here that situation does not exist."

In our judgment the provision under which the distributor agrees to purchase "all materials necessary for the manufacture of special units, such as paint, screen cloth and miscellaneous items, glass excepted," from the company, and the further provision that the distributor agrees to follow rigidly the company's specifications covering the manufacture of such units, clearly establish that plaintiff is seeking to force distributors to buy non-patentable material from the plaintiff to be used in the assembly and installation of its patented structure.

Mr. Justice Brandeis, speaking for the Supreme Court, said in Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, on page 463, 58 S.Ct. 288, on page 290, 82 L.Ed. 371: "* * * The Court held in the Carbice Case, (Carbice Corporation v. American Patents Development Corporation, 283 U.S. 27, 51 S. Ct. 334, 75 L.Ed. 819) that the limitation upon the scope or use of the patent which it applied was 'inherent in the patent grant.' It denied relief, not because there was a contract or notice held to be inoperative, but on the broad ground that the owner of the patent monopoly, ignoring the limitation 'inherent in the patent grant,' sought by its method of doing business to extend the monopoly to unpatented material used in practicing the invention."

Again we are constrained to agree with the conclusion of the trial court. Of course, its finding and conclusion as to misuse in the case at bar is not critical or important since patent No. 2,262,670 is found invalid on other grounds. However, we express our conclusion on that issue in order to hasten the ending of this litigation.

The judgment of the District Court is affirmed.