The F. C. RUSSELL COMPANY, Appellant,

v.

CONSUMERS INSULATION COMPANY.

No. 11518.

United States Court of Appeals Third Circuit.

Argued June 13, 1955.

Decided Oct. 18, 1955.

William C. McCoy, Cleveland, Ohio (McCoy, Greene & TeGrotenhuis, Cleveland, Ohio, William L. Dill, Jr., Stryker, Tams & Horner, Newark, N. J., Frank S. Greene, William C. McCoy, Jr., McCoy, Greene & TeGrotenhuis, Cleveland, Ohio, of counsel, on the brief), for plaintiff-appellant.

Maxwell James, New York City (Benjamin Stadtmauer, Garfield, N. J., on the brief), for defendant-appellee.

Before BIGGS, Chief Judge, and GOODRICH and McLAUGHLIN, Circuit Judges.

BIGGS, Chief Judge.

Russell sued Consumers, alleging infringement of United States Letters Patent No. 2,262,670 and seeking damages and an accounting. Consumers answered, denying infringement and the validity of Russell's patent, and also asserted misuse of the patent by Russell. Both Russell and Consumers stipulated that if Consumers prevailed on its defense of misuse, Russell should grant Consumers an irrevocable, royalty-free, non-exclusive, non-assignable license (subject to certain exceptions not pertinent here) to manufacture, use and sell the windows covered by the patent, and that the suit should be dismissed without determination of the issues of validity or infringement. Russell and Consumers stipulated into the record in this case the transcript of the record in the case of F. C. Russell Co. v. Comfort Equipment Corp. in the United States Court of Appeals for the Seventh Circuit, 1952, 194 F.2d 592, and D.C.N.D.Ill.1951, 97 F.Supp. 784. That record and other provisions embraced in the stipulation cover every pertinent issue presented by the appeal at bar. The court below found Russell guilty of misuse and dismissed the suit in accordance with the stipulation. See 119 F.Supp. 119. The appeal at bar followed.

Russell manufactures and sells steel and aluminum combination storm and screen windows directly and through distributors and dealers under the trademarks "Rusco", "Cinco", and "Thermoseal",[1] all registered under the Trade-Mark Act, 15 U.S.C.A. § 1051. These windows embody the disclosures of the patent in suit; each is advertised and sold as "A product of the F. C. Russell Company, Cleveland, Ohio."

Russell is the largest manufacturer of combination storm and screen windows in the United States. In the years 1947, 1948 and 1949, its sales were over $10,000,000 annually. Its business amounts to about 10% of the total sales in the field. It spends from $200,000 to $250,000 annually in national advertising. It has 76 distributors of Rusco windows and 32 distributors of Cinco, Thermoseal, or Cinco-Thermoseal windows. It has about 450 dealers.

Russell entered into sales agreements with its Rusco distributors which recite that Russell owns two patents, including the patent in issue, and patents pending, under which it "controls the manufacture and distribution" of Rusco windows, and designate territories in which the respective distributors shall have the right to sell and install the windows. These agreements provide that the distributors shall purchase Russell's standard windows and knocked-down units for special size windows. Article IV of a typical agreement also states: "Second Party [the distributor] shall at all times during the life of this agreement use its best efforts to promote the sales within the aforesaid territory. It will, at all times, display, in its salesroom or office, suitable samples and displays of said windows for sales demonstration purposes. Second Party further agrees to

---

1. Until 1951 Russell sold two types of aluminum windows known as Cinco and Thermoseal. In 1951 it developed a modified type which it permits its distributors and dealers to sell as Cinco, Thermoseal, or Cinco-Thermoseal.

maintain an adequate sales organization devoted exclusively to the sale of said windows, and further agrees not to merchandise or offer for sale any merchandise which could be competitive with any articles, items or merchandise manufactured and/or distributed by the first party [Russell], without the written approval of First Party." The distributor-sales agreements for the other trade-mark windows are substantially the same in tenor.

Russell supplies its distributors with a dealer franchise agreement providing, *inter alia,* that the "Dealer further agrees * * * not to sell any other storm windows." It is estimated that 30 to 100 dealers operate under this form. The others operate under oral contracts or special agreements worked out with the distributor.

Russell also entered into warranty agreements with each of its distributors of Rusco steel [2] windows which provide in part that the windows will be made in a certain way of specified materials and that, if the distributor finds it necessary to repair or replace any installed unit because of rusting or corroding, Russell will compensate him for the labor and material involved. "Special units", windows of odd sizes, are to be manufactured by the distributors. A typical warranty contract provides: "The Distributor agrees to purchase all materials necessary for the manufacture of special units from the Company, such as paint, screen cloth and miscellaneous items, glass excepted. The Distributor further agrees to rigidly follow the Company's specifications covering the manufacture of said units. This applies particularly to the painting requirements calling for Rusco baked-on outdoor enamel. Any deviation will release the Company from any liability hereunder."

The issues of law in this case are narrow ones. The first is: Do Russell's *sales agreements with its distributors, and through them with their dealers,* constitute use of its patent monopoly to restrain or suppress competition in combination storm and screen windows? The second issue is: Do Russell's *warranty agreements with its distributors* constitute an attempt by Russell to obtain a monopoly over the unpatented materials used by its distributors in manufacturing special units for odd size windows? The district court found that Russell had misused its patent in both these ways.

The answer to the first question turns on our decision in National Lockwasher Co. v. George K. Garrett Co., 3 Cir., 1943, 137 F.2d 255, 256. The pertinent facts in the cited case are as follows: National, the owner of a valid patent on a compression spring lock washer, licensed manufacturers under a standard form of agreement providing that the licensee would not manufacture any form of non-tangling spring washers other than those covered by the patent. There were in existence other types of unpatented non-tangling lock washers. We said: "So what we have here * * * is a patentee who gives a license to a manufacturer for a stipulated consideration, part of the consideration being that the licensee will abstain from manufacturing any other kind of non-tangling spring washer except those covered by the license. * * * [The patentee is] using its patent monopoly to suppress the manufacture of possible competing goods not covered by its patent. * * * [T]he Supreme Court [has] held that a trade agreement involving price fixing and the suppression of a certain type of merchandise transcended what was necessary to protect the use of the patent or the monopoly which the law conferred upon it. Standard Sanitary Mfg. Co. v. United States, 1912, 226 U.S. 20, 49, 33 S.Ct. 9, 57 L.Ed. 107. * * * [The patentee] is attempting by means other than that of free competition to extend the bounds of its lawful monopoly to make, use and vend the patented device to the extent where such device would be

---

**2.** The warranty agreements relate to steel windows only. They do not relate to windows made with aluminum frames.

the only one available to a user of such an article. This monopoly is obviously not covered by the patent. A patentee's right does not extend to the use of the patent to purge the market of competing non-patented goods except, of course, through the process of fair competition." See also McCullough v. Kammerer Corp., 9 Cir., 1948, 166 F.2d 759.

Russell attempts to assert a number of defenses to the foregoing. It contends that the real test is whether or not it has enforced or attempted to enforce the invalid provisions of its sales agreements to which we have referred. *Ergo*, says Russell, there is no showing that it has gone beyond the purpose and limits of the protection of the patent. It relies in large part on the March 31, 1955 report of "The Attorney General's National Committee to Study the Anti-Trust Laws", which commented specifically on Russell's case in the Seventh Circuit Court of Appeals, cited above. The comments in pertinent part are set out in the footnote.[3]

Russell insists that it has not attempted illegally to extend the scope of its patent monopoly. But here is a field of competitive selling in which the holder of a patent by way of agreements, at least related to a patent monopoly, has given itself the power to control both distributors and dealers if it wishes to do so. The inchoate threat which these circumstances engender hangs in the air and we may doubt that that threat is without its effect in a highly competitive market. We cannot agree with the Attorney General's Committee, distinguished as its membership is, when the Committee says in commenting on Russell v. Comfort, that "there was nothing to indicate that * * * [the patent] had any practical relationship with the exclusive agreement." There is in fact a relationship and it seems to us to be a very practical one, for it may not be assumed that the contracts and the patent came into juxtaposition inadvertently or accidentally. The parties, their dealers, distributors and, indeed, their customers, are not living in a strange, non-commercial world where exclusive agreements are found under Christmas trees.

But, aside from the foregoing, the Supreme Court has held that whether an illegal provision of a contract is or is not enforced makes no difference if the contract gives the patentee, as here, the power to effect enforcement. See, for example, United Shoe Machinery Corp. v. United States, 1922, 258 U.S. 451, 458, 42 S.Ct. 363, 66 L.Ed. 708, and similar decisions. Certainly, if the law is to be changed in this respect, it should be altered by the Supreme Court and not by this tribunal.

In view of our disposition of this first question, it is unnecessary to determine whether Russell misused the patent monopoly in any other fashion. We also find it unnecessary to discuss any defense dependent on a future suit based possibly on the Clayton Act, 15 U.S.C.A. § 12 et seq.

The judgment of the court below will be affirmed.

---

3. The Committee said in its comment on the Russell v. Comfort case, Report of the Attorney General's National Committee to Study the Antitrust Laws, March 31, 1955, at p. 251:

"a. Scope of the Misuse Doctrine.

"The outer reach of the misuse doctrine has not yet been fully defined. We believe, however, that the doctrine should extend only to those cases where a realistic analysis shows that the patent itself significantly contributes to the practice under attack. A mere theoretical analysis without consideration of actual commercial effect is misleading, for then almost any use of a patent—even an ordinary infringement suit—can be attacked on the ground that its repercussions extend to commerce outside the range of the patent. *Thus in Russell v. Comfort injunctive relief for patent infringement was denied because the patented product was marketed through exclusive dealer agreements. While the patent was mentioned in the recitals of the agreements, there was nothing to indicate that it had any practical relationship with the exclusive agreement or bearing on the enforcement of the patent. We believe that the approach of this case confuses the conduct of the patentee in relation to the patent and his conduct with reference to other matters.*" (Emphasis Russell's.)

See digest in 105 USPQ III, IV.