**COLUMBUS AUTOMOTIVE CORPORATION, Plaintiff,**

v.

**OLDBERG MANUFACTURING COMPANY, Defendant.**

Civ. A. No. 9482.

United States District Court
D. Colorado.

Feb. 24, 1967.

Fred M. Winner and Clarke W. Karr, Denver, Colo., for plaintiff.

Holland & Hart, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

WILLIAM E. DOYLE, District Judge.

This is a civil action for a declaratory judgment and an accounting. Jurisdiction is based upon diversity of citizenship, but is limited to the purposes of an agreement between the parties dated September 30, 1965, wherein defendant agreed to waive valid objections to service of process and venue to permit suit in this Court. The case is therefore limited to the scope of the original Complaint, defendant's counterclaims and plaintiff's supplemental complaint having been dismissed previously without prejudice.

Plaintiff is a New York corporation having its principal place of business in Colorado. Defendant is a Michigan corporation having its principal place of business there, and is the successor of Heckethorn Manufacturing & Supply Company, a former Colorado corporation which has lost its corporate existence by a merger with the defendant in 1963. Under this merger, defendant has assumed all the liabilities and obligations of Heckethorn, including the obligations which are the subject of this action.

The cause was tried to the Court. The basic factual issues relate to the interpretations of certain contractual provisions agreed to by plaintiff and Heckethorn.

The relationship between plaintiff and Heckethorn goes back to September 14, 1949. On that date plaintiff, representing that it had the exclusive right in the United States and other territories to manufacture and sell, and to grant licenses to others to manufacture and sell certain monotube shock absorbers under the patents of Christian de Carbon, a French inventor and manufacturer, entered into a contract with Heckethorn wherein the latter was to manufacture and sell de

Carbon shock absorbers in the United States and pay plaintiff a stated royalty.

The basic agreement important to this action was entered into on February 28, 1955. This new agreement between plaintiff and Heckethorn pertained to the manufacture and sale of the de Carbon monotube shock absorbers. It expressly superseded all prior understandings and agreements.

In this 1955 agreement Columbus granted Heckethorn the sole and exclusive right, license, privilege and authority to make, use and sell the product in the United States and its possessions. The agreement further provided for the payment of royalties, allowance of advertising expense to the licensee, the marking of each shock absorber, the undertaking by the licensee to use its best efforts to develop the product, the undertaking by both parties to disclose new inventions and improvements with respect to the product, and other specific provisions. Article XX of the agreement restricted Heckethorn from manufacturing or selling any other shock absorber competitive with those covered by the patent. This provision, which is the center of controversy in this action, provides as follows:

"XX. For the duration of this contract, Heco agrees not to manufacture, sell or dispose of any other shock absorber which is competitive with the shock absorbers covered by said Patents. Heco may not sell shock absorbers in countries other than the territory covered hereby without the consent of Columbus provided, however, that automobiles equipped with such shock absorbers may be sold in any territory and Heco agrees for the importation into the territory covered hereby of any such equipped automobiles coming from territories not covered hereby. Heco agrees to make available to Columbus or, at its request, to de Carbon, all engineering and manufacturing data relating to the manufacture of shock absorbers hereunder."

Heckethorn sold a controlling stock interest to AP Parts Company in 1958. During the next few years AP acquired the remainder of Heckethorn's stock. In 1963, AP Parts brought about a merger between Heckethorn and the defendant Oldberg Manufacturing Company, which was another of its wholly owned subsidiaries. This accounts for the presence of Oldberg as defendant.

In the latter part of 1961 or early 1962 AP Parts determined to manufacture a two-tube shock absorber in addition to the de Carbon type. To that end it began, through Heckethorn, market and design studies in an effort to bring such a two-tube type into production at an early date. An initial problem in AP's determination to have Heckethorn, rather than one of its other subsidiaries, develop and produce the two-tube shock absorber, was the restrictive provision of Article XX of the 1955 License Agreement, supra. In this article Heckethorn had agreed "not to manufacture, sell or dispose of any other shock absorber *which is competitive with* the shock absorbers covered by said [de Carbon] Patents." [Emphasis added]. Because of the concern of AP and of Heckethorn that the development and production of a two-tube shock absorber would violate Article XX, in the early part of July, 1962, representatives of the plaintiff and Heckethorn met with Mr. de Carbon in Paris to explore the question of Heckethorn's entry into the two-tube shock absorber market. The Paris conversations resulted in the drafting and execution of four documents, all typed on plaintiff's letterhead, and all dated July 3, 1962, setting forth certain agreements reached by the parties.[1]

1. Copies of these documents were received as Plaintiff's Exhibits 1, 41, 42 and 43. Omitting formal parts, they provide as follows:

*Plaintiff's Exhibit 1*
*Subject: Two tube shock*
"We hereby agree, in view of your explanation of the United States market

The agreement to pay plaintiff a one per cent royalty on all two-tube shock absorbers sold, as provided in Plaintiff's Exhibit 1, was honored by Heckethorn and Oldberg until October, 1964, at which time it was repudiated by defendant as an illegal misuse of patents. Whereupon, plaintiff served defendant with a Demand for Arbitration in July, 1965, as required by the 1955 License Agreement. Subsequently, the parties agreed to waive arbitration and the defendant agreed to the venue of this action.

The plaintiff seeks an adjudication declaring that it is entitled to royalties under the letter agreement of July 3, 1962 (Plaintiff's Exhibit 1), an accounting for accrued and unpaid royalties, and a judgment in the amount shown by the accounting to be due.

The defense is that the "non-compete" clause of the 1955 License Agreement (Article XX) is an unlawful extension of the patent monopoly and a patent misuse; that the letter agreement of July 3, 1962 (Plaintiff's Exhibit 1), having been entered into as an enforcement by plaintiff of this unlawful clause, is likewise invalid and unenforceable as against public policy in that it constitutes a misuse of patents. It is also claimed that it is an unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. In either event, according to defendant, the July 3, 1962 royalty agreement is invalid for lack of consideration. As a further defense, defendant maintains that it is unenforceable as having been made under circumstances of economic duress and business compulsion.

Plaintiff's response is that the one per cent royalty is not solely tied to the "non-compete" clause of the License Agreement, but was agreed to by Heckethorn in consideration for various contributions made by plaintiff to the enterprise. Some of these additional considerations, plaintiff asserts, are embodied in the other three documents executed on July 3, 1962, which with Plaintiff's Exhibit 1 are to be construed together. In effect, plaintiff's position is that even if the "non-compete" clause of the license agreement is a misuse of patent, the waiver of its operation was not the only consideration for the one per cent royalty. The royalty is supported by other consideration and cannot be repudiated by the

and the need for a low cost unit to accept a token royalty of one (1) per cent of net sales price in consideration of our approval to your manufacture of said unit not involving de Carbon patents."

*Plaintiff's Exhibit 41*

"We hereby agree that Heckethorn will, upon our request, provide technical assistance of Licensee's in new territories on the following conditions:
1. Out of pocket expense will be paid on receipt of invoices by Columbus Automotive Corporation.
2. Heco will receive 15% of total royalties paid by new Licensee to Columbus Automotive Corporation.
3. Any parts requested by the new Licensee will be supplied upon their acceptance of Heco's quotation."

*Plaintiff's Exhibit 42*

Subject: Level-Ride

"We hereby confirm agreement that we shall waive royalty on the spring portion of non pressurized spring shock unit and also assignment of patent, if granted.

"Royalty will be paid, as in the past, on the Heckethorn net realized price of the shock unit only."

*Plaintiff's Exhibit 43*

Subject: Levelizer

"We hereby confirm the following Agreement in regard to the royalty rate to be paid on the Levelizer, your new pressurized spring shock unit as covered by Patent Application Case 57.

"Such royalty is to be paid at the rates specified in the License Agreement dated February 28, 1955, paragraph 3 but to be calculated on 60 per cent of the net realizing price of said unit.

"It is also agreed that you will assign to us and we to de Carbon the Patent when granted in the manner as provided in the License Agreement.

"It is understood that we are waiving royalty payment on the spring portion of the subject unit on the understanding that Heckethorn will defend the Patent if granted in its own marketing territory. It is further agreed that Heckethorn will have no responsibility to defend such Patent outside of its marketing territory."

defendant. Plaintiff also argues that the "non-compete" clause of the License Agreement is not a patent misuse.

■ A patent is a grant of the right to exclude others from making, using or selling one's invention, and includes the right to license others to make, use or sell it. It is a legitimate monopoly having as it primary purpose the advancement of the arts and sciences rather than reward to the individual. It is not a certificate of merit, but an incentive to disclosure. Sinclair & Carroll Co. v. Interchemical Corporation, 325 U.S. 327, 330–331, 65 S.Ct. 1143, 1145, 89 L.Ed. 1644 (1945).

The history of the administration of patents has been one of reconciling the inventor's private rewards with the public interest in promoting progress. Kendall v. Winsor, 21 How. 322, 327–329, 16 L.Ed. 165 (1898). To protect the interest of the public, courts have resisted attempts to enlarge the monopoly granted by the patent. Thus, in the so-called "tie-in" cases, it has been held a misuse of patents to require the licensee to purchase from the patentee other patented or unpatented articles not within the scope of the licensed patent. McCullough Tool Company v. Well Surveys, Inc., 10th Cir. 1965, 343 F.2d 381, cert. denied 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966), and cases cited at 343 F.2d 406–407.

■ This concept of patent "misuse" has evolved as an equitable principle which requires a court of equity to deny relief to the patentee who uses his patent monopoly to restrain competition. Triumph Hosiery Mills v. Alamance Industries, Inc., M.D.N.C.1961, 191 F.Supp. 652, 660, aff'd. 299 F.2d 793, 4th Cir. 1962, cert. denied, 370 U.S. 924, 82 S.Ct. 1566, 8 L.Ed.2d 504 (1962). The doctrine is not however limited to equitable suits for patent infringement but has been applied as well in actions to recover unpaid royalties arising under a license agreement. Park-In Theatres v. Paramount-Richards Theatres, D.Del.1950, 90 F.Supp. 730. To establish the defense of patent misuse, it is not necessary to show a violation of the Clayton Act. Morton

Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942); Berlenbach v. Anderson & Thompson Ski Co., 9th Cir. 1964, 329 F.2d 782, 784. A showing of an actual monopoly or a tendency to create such in a line of commerce is not necessary. It is sufficient to show the existence of restrictive agreements which tend to suppress competition with non-patented articles. And it matters not whether the particular party has suffered from the patentee's misuse; the adverse effect upon the public interest is the primary concern. Morton Salt Co. v. G. S. Suppiger Co., supra, 314 U.S. at 494, 62 S.Ct. at 406.

■ Nor does it matter what form or method the patentee selects to attempt to extend his patent. United States v. Univis Lens Co., Inc., 316 U.S. 241, 62 S. Ct. 1088, 86 L.Ed. 1408 (1942). Thus, in National Lockwasher Co. v. George K. Garrett Co., 3rd Cir., 1943, 137 F.2d 255, the court dismissed plaintiff's patent infringement suit because a provision in its license agreements restricting competitive activity was deemed an unwarranted extension of its patent monopoly. The restrictive clause provided that:

"Licensee agrees, that while this agreement is in force, it will make and sell no form of non-entangling Spring Washers except such as are covered by said patent, and that it will not, either directly or indirectly, make or sell Spring Washers of the kind specifically excluded from this license under the provisions of Paragraph First (a) hereof."

The court said, at page 256:

"These cases are different on the facts than the one here involved. The patentee in this case is not selling any unpatented goods under a tying-in clause to the licensee. But it is, as the facts are alleged by the defendant, using its patent monopoly to suppress the manufacture of possible competing goods not covered by its patent. Prior to the cases above cited the Supreme Court had held that a trade agreement involving price fixing and the suppression of a certain type of merchandise

transcended what was necessary to protect the use of the patent or the monopoly which the law conferred upon it. Standard Sanitary Mfg. Co. v. United States, 1912, 226 U.S. 20, 49, 33 S.Ct. 9, 57 L.Ed. 107. We think the instant case, on the facts as the defendant represents them, falls within the principle of the cases cited to the extent that the patentee is using the lawful monopoly granted by the patent as a means of suppressing the manufacture and sale of competing unpatented articles. It is not creating for itself a monopoly for unpatented goods, as in some of the cases cited. But it is attempting by means other than that of free competition to extend the bounds of its lawful monopoly to make, use and vend the patented device to the extent where such device would be the only one available to a user of such an article. This monopoly is obviously not covered by the patent. A patentee's right does not extend to the use of the patent to purge the market of competing nonpatented goods except, of course, through the process of competition."

The Lockwasher decision was followed in McCullough v. Kammerer Corp., 9th Cir. 1948, 166 F.2d 759, cert. denied, 335 U.S. 813, 69 S.Ct. 30, 93 L.Ed. 368 (1948), where the License Agreement provided that the licensee would not, during the term of the license manufacture, use or rent any device which would be "in competition with the device or devices covered by this agreement." 166 F.2d at 760. The court held that this restriction unreasonably extended the monopoly of the patent.

"We agree with that circuit [the 3rd Circuit in National Lockwasher Co. v. George K. Garrett Co., supra 137 F.2d 255] that there is no difference in principle between extending the monopoly of the patent by suppressing the manufacture or use of competitive devices, patented or unpatented, and the extension of the monopoly by prohibiting the use in making the patented ar-

ticle of unpatented articles competing with those made by the licensor's subsidiary, held against the public interest in Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 493, 62 S.Ct. 402, 86 L.Ed. 363." 166 F.2d at 761.

In Park-In Theatres v. Paramount-Richard Theatres, supra, the action was to recover royalties. The defense interposed patent misuse issues based on a provision of the license agreement prohibiting the licensee from constructing, using or operating any drive-in theatre not licensed by the licensor. In an early opinion, 81 F.Supp. 466, the Delaware District Court held that the *Lockwasher* and *McCullough* principles were applicable but deferred final determination pending an inquiry as to whether the case was squarely within the doctrine of these decisions. Subsequently, however, the defendant's motion for summary judgment was granted, the court finally concluding that the misuse principle applies to both exclusive and nonexclusive licenses. The holding of the case was that where the patent monopoly is used to suppress competition the license agreement based thereon is thereby rendered unenforceable. Park-In Theatres v. Paramount-Richards Theatres, 90 F. Supp. 730 at 735, aff'd. 3 Cir. 1950, 185 F.2d 407. See also F. C. Russell Co. v. Consumers Insulation Co., 3 Cir. 1955, 226 F.2d 373, and also Berlenbach v. Anderson & Thompson Ski Co., supra. In this latter case the court carried the misuse concept much further than have the other decisions. There the patent misuse provision had been contained in an agreement between the patentee and a third party. Our own circuit has considered the misuse question in McCullough Tool Co. v. Well Surveys, Inc., supra, and also in North Drive-In Theatre Corp. v. Park-In Theatres, 10 Cir., 1957, 248 F.2d 232. In the latter case the recovery was allowed on the basis of the court's construction of the allegedly restrictive provision and its holding that the provision was ambiguous and susceptible to a nonrestrictive construction.

The court, speaking through Chief Judge Murrah, said:

"The appellants next contend that the license agreements, when considered by the whole of their parts, are so restrictively monopolistic in restraint of trade as to be contrary to public policy and unenforceable. Particularly they say that the license agreement by design and effect, extends the monopoly beyond the scope of the patent. They point to that provision in the license providing in substance that if the licensee 'desires to construct, make, build or operate any additional drive-in theatres within the territory defined in the granting clause', it may do so by first entering into a separate license agreement with the licensor 'in respect to each and every such drive-in theatre prior to the commencement of its construction, which separate license agreement shall be precisely the same' as the agreements in suit.

"The appellants construe the words 'any additional drive-in theatre' as forbidding the licensee to construct any other drive-in theatres, whether covered by the subject matter patent or not, and then say that so construed, this provision operates to extend the patent beyond its legitimate scope—hence a prohibited misuse. Prior to the execution of these agreements, more restrictive clauses in appellee's license agreements had been condemned as a misuse in Park-In Theatres v. Paramount-Richards Theatres, D.C., 81 F.Supp. 466; Id., D.C., 90 F.Supp. 727, 730. Apparently as a consequence of this litigation, the licensor reframed this provision of its contract to read as we have recited. The trial court construed the critical words as meaning any drive-in covered by the patent. Surely the words are susceptible of such construction and we will not give them a sinister meaning if they are susceptible of a legitimate one. No such construction of the contract was asserted by the appellees and we should

accord it a lawful interpretation." 248 F.2d at 236.

In summary it is to be concluded that this doctrine of patent misuse has been applied in both equity suits and actions for royalties and that its basis is not only the "clean hands" doctrine, but is also in furtherance of a public policy against enforcement of an agreement which is contrary to the public interest by reason of its unlawful tendency to suppress competition and unreasonably extend the patent monopoly.

We do not believe Article XX is susceptible of a construction which will give it a legitimate effect. Heckethorn, and later the defendant, are thereby prohibited from manufacturing, selling or disposing of "any other shock absorber which is competitive with the shock absorbers covered by said Patents." There is no patent ambiguity here. The provision is a clear restriction, and is particularly similar to the prohibition in *F. C. Russell*, supra.

Plaintiff also argues that the term "shock absorber" is limited to shock absorbers covered by the de Carbon patent, and constitutes nothing but an innocuous commitment by the licensee not to be an accessory to any unlicensed infringement of the patent. We regard the phrase, however, as a generic term which refers to *any* type of shock absorber. This is especially clear in view of the qualifying clause "which is competitive with the shock absorbers covered by said Patents."

Plaintiff's further argument is that the phrase "which is competitive with" includes only the monotube shock absorber of which the de Carbon is a representative model; that the two-tube shock absorber for which the unpaid royalties are alleged to be due is manufactured for a different, lower-priced market, and is not a competitor with the higher-priced, monotube type; and that the July 3, 1962 agreement permitting Heckethorn to manufacture a two-tube device (Plaintiff's Exhibit 1) was not a "waiver" of the Article XX restriction since the restriction never applied to the

two-tube shock absorber. The only effect of this would be to reduce the scope of the patent misuse. It does not erase it. Heckethorn would still be prevented from producing a competitive one-tube shock absorber. And, whether an illegal provision of a contract is or is not enforced is immaterial so long as the patentee has the power to enforce it. F. C. Russell Company v. Consumers Insulation Company, supra; Berlenbach v. Anderson & Thompson Ski Co., supra. Cf. Report of the Attorney General's Committee on the Antitrust Laws (1955), pp. 254–255.

However, plaintiff's argument with respect to the coverage of the phrase "which is competitive with" does bear upon its alternate contention that the alleged "waiver" of Article XX was not the real consideration for permitting Heckethorn to manufacture the two-tube unit; that there were other considerations which gave rise to defendant's obligation to pay royalties on the two-tube shock absorber.

In final analysis plaintiff's case boils down to this contention that the other considerations support the waiver agreement. Indeed, plaintiff has conceded that if the sole consideration for the one per cent royalty was the waiver of Article XX that it would be a patent misuse.[2]

■ We do not think the evidence supports plaintiff's position. To say there was "other" consideration strains the express language of the July 3, 1962 agreement. Plaintiff's Exhibit 1 states on its face that the royalty is to be paid "in consideration for our [plaintiff's] approval to your manufacture of said [two-tube] unit not including de Carbon

patents." This states in express terms the consideration to be the granting of permission to manufacture the two-tube unit.

Furthermore, although certain things occurred about the time of the 1962 Paris meeting which were beneficial to Heckethorn, there is no indication they were intended as consideration for the royalties. Plaintiff's theory is that the Heckethorn representatives went to Paris to obtain technical assistance in developing a two-tube shock absorber which they had already decided to manufacture. Plaintiff asserts that Heckethorn was promised such assistance, and at the same time the parties agreed to the matters set forth in Exhibits 41, 42 and 43. Plaintiff contends that all of these factors were part of the total agreement reached by the parties, and formed the basis for defendant's promise to pay royalties on the two-tube unit.

■ It is to be noted that plaintiff has offered extraneous evidence in explanation of the July 3, 1962 written agreement (Plaintiff's Exhibit 1). Evidence that the stated consideration in a written instrument was not the whole consideration is admissible if it is offered as part of the process of showing that the writing is not a complete integration of all the terms of the agreement. 3 Corbin, Contracts 586, pp. 496–98; Marquart v. Clark, 109 Colo. 62, 121 P.2d 885 (1942). This evidence was admitted not because Exhibit 1 is ambiguous on its face, but because the disagreement among eminent counsel as to its meaning suggested the possibility of some latent ambiguity. See Franklin v. American Nat. Ins. Co., 10th Cir. 1943, 135 F.2d

2. During the trial, the following colloquy occurred between the Court and plaintiff's counsel:

"The Court: Do you concede that if it does appear that the sole consideration for this letter agreement was the release from the non-compete covenant, that that would constitute a misuse of patents? That that would bar a lawsuit?

"Mr. Winner: I almost concede that. Let me qualify it to this extent. If, additionally, it tends to create a monopoly, I readily concede it. Whether it must or must not tend to create a monopoly I think is a close question. But, for the sake of this argument, Your Honor, I will concede, arguendo, that if that was the sole consideration, it would be a misuse of patents. And with that concession, it is clearly not the sole consideration. The record is abundantly clear that there were many additional considerations * * *"

531, 534. We felt that plaintiff should have every opportunity to prove its case. Having extended that opportunity to plaintiff it was incumbent on it to carry the burden of proving the matter in dispute. Plaintiff had the burden of proving the existence of other consideration for defendant's promise to pay royalties and it has not succeeded in sustaining it.

In late 1961, or early 1962, when AP Parts decided to manufacture a two-tube shock absorber in addition to the de Carbon monotube, it began, through its subsidiary Heckethorn, market and design studies to bring the two-tube to production at the earliest possible date. Heckethorn had previously done some development work on a two-tube shock absorber of a different type, and was not entirely without experience for the proj-ect. Nevertheless, it undertook a detailed technical survey of the various two-tube shock absorbers then on the market. This included discussions with other de Carbon licensees, particularly the Girling Company, an English firm, which had had experience in manufacturing two-tube units. There is no question that the assistance furnished by plaintiff's licensees, especially Girling, enabled Heckethorn to go into production within a relatively short time after beginning the project.[3] However, it does not appear that this assistance formed part of the consideration for Heckethorn's promise to pay royalties on the two-tube unit. Rather it is clear from the record that it was furnished because of Heckethorn's membership in the de Carbon "family" of licensees, among whom the interchange of information was a common practice.[4]

3. Plaintiff also argued that Heckethorn's experience, as a de Carbon licensee, in producing the monotube shock absorber over a period of years, was instrumental in bringing the two-tube unit to production so quickly. We do not question this, but it is of no help to plaintiff's claim for the disputed royalties. Obviously, it was only a past consideration which can furnish no basis for defendant's promise to pay royalties in 1962.

4. For example, the direct examination of plaintiff's witness, Mr. David Alan Avner, consulting engineer for Amortisseurs de Carbon (de Carbon Shock Absorbers), elicited the following:
"Q. Would that drawing or would any of the other information which was furnished to Mr. Heckethorn have been furnished to him had they not been de Carbon licensees?
"A. Very definitely no. This was an experimental drawing by Girling. It was not and in fact has never been put in production.
"Q. And at that time it was disclosed as a confidential drawing?
"A. Yes.
"Q. Why was it disclosed to Heckethorn?
"A. Purely because he was a member of the de Carbon association of companies and we had no secrets from each other. In the Girling license agreement with Monsieur de Carbon there was a provision for free interchange of all information between licensees."

During the direct examination of defendant's witness Mr. John E. Heckethorn, vice president of Heckethorn Manufacturing Company, the following statements were made:
"Q. Do you recall a visit to your Dyersburg plant by Mr. Avner and Mr. Butler of Girling, Limited, in England, around Easter of 1962?
"A. Yes, I do.
"Q. Would you describe what happened at the time of that visit by them?
"A. Well, Mr. de Carbon had written to us and informed us that the Girling people were going to go into the two-tube, or go into the monotube shock absorber business, using his patents, and he said he would appreciate it if we would show them every courtesy when they were in the United States. I was later contacted by Mr. Avner and Mr. Butler and arranged to pick them up in Memphis, and drive them to Dyersburg; take them on a tour of the plant.
"Q. Do you recall how long they were in your plant at that time?
"A. I think they just stayed there possibly two days.
"Q. Was the subject of the two-tube shock absorbers discussed during their visit?
"A. Possibly, in a general way; just comparing the problems of two-tube shock absorbers with the problems of monotube shock absorbers, and so forth."
And further, during the direct examination of plaintiff's witness Mr. Raymond

Indeed, Article VII of the 1955 License Agreement, supra, specifically obligated plaintiff to disclose technical information to Heckethorn. This free exchange of information was a long established custom within the de Carbon family. Without a clear indication to the contrary, we see no reason to assume that the agreement embodied in Plaintiff's Exhibit 1 was a deviation from the established practice.[5]

Plaintiff also claims that the continued use of the "Columbus" trade name by Heckethorn and the defendant was a valid consideration for the promise of royalties on the two-tube unit. This is most unlikely in view of the evidence establishing that plaintiff had no proprietary interest in the single name "Columbus" at the time the July 3, 1962 royalty agreement was executed. Plaintiff did register a trademark on May 1, 1951 (Plaintiff's Exhibit 9) which incorporated the words "Columbus Automotive Corporation" in circular fashion around the design of a ship. But this Registration Statement specifically disclaimed the words "Columbus Automotive Corporation" apart from the mark as shown. Furthermore, the trademark itself had been cancelled at the time of the July, 1962 meeting in Paris (Defendant's Ex-

---

E. Duboc, president of Columbus Automotive Corporation, the following colloquy occurred:

"Q. Who arranged for the visit of the Girling representatives to the [Heckethorn] Dyersburg plant?

"A. Mr. de Carbon, I believe. And subsequent to that, maybe a month after that, Jack Heckethorn went to Girling with the Girling people. Heckethorn was invited by them to go to England and did visit Girling. That was I believe in May or June, 1962.

"Q. Now what reason would Heckethorn have for giving Girling trade information or the other way around?

"A. Well, on the license agreement a free exchange of information on engineering was done, and at that time Heckethorn was very much interested to see what Girling was doing in England, as they were analyzing every shock absorber, and as I recall was very much interested to visit Girling and see what they were doing. At that time Girling was not making de Carbon type shock absorbers. They were still making the two-tube shock absorbers, though.

"Q. Well, over all the years what was done between de Carbon and all of the de Carbon licensees concerning the interchange of trade information?

"A. They exchange labor; they exchange drawings; they exchange method. Bill Stine, a licensee of de Carbon in Germany, and Ruiz, he is a licensee of de Carbon in Spain, and Jack Heckethorn visit them.

"Q. Well, was there ever any payment exchanged for this technical information?

"A. No, sir, it was free."

5. Plaintiff lays much importance on the fact that in a letter (Plaintiff's Exhibit 37), dated January 4, 1962, to Mr. Duboc from W. R. Heckethorn, then president of Heckethorn Manufacturing & Supply Co., Heckethorn indicated it would stop expending "engineering effort, either time or money, to further Columbus or de Carbon's activities in the establishment of new licensees," and the further fact that one of the July 3, 1962 letter agreements, Plaintiff's Exhibit 41, apparently implements this resolution by providing for certain remunerations to Heckethorn for providing technical assistance to plaintiff's licensees in new territories. Plaintiff asserts that the royalties referred to in Exhibit 41 represented a change in the free information policy with respect to Heckethorn, wherein the latter was to pay and be paid for information thereafter received or given. Assuming plaintiff is correct, this does not mean that the payment of royalties promised by Heckethorn in Plaintiff's Exhibit 1 was consideration for the promise of information concerning the two-tube shock absorber. On the contrary, the fact that the change in the established free information policy is express and clear from the terms of Exhibit 41, but is nowhere indicated in Exhibit 1, leads to the conclusion that the giving of technical information to Heckethorn was not part of the consideration for the latter's promise to pay the one per cent royalty. The more reasonable inference is that had the matter of technical information been part of the bargain embodied in Exhibit 1, the parties would have expressly referred to it in the agreement, especially since their customary practice had been to exchange information freely.

hibit 30). AP Parts did register the name "Columbus" on January 5, 1965, (Plaintiff's Exhibit 52), and this name is and has been used on the two-tube shock absorbers manufactured by defendant,[6] but this latter has no significance in connection with the agreement reached in 1962.

Nor are we persuaded that the agreements embodied in Plaintiff's Exhibits 41, 42 and 43, are to be considered as one with Plaintiff's Exhibit 1, and as importing consideration for defendant's promise to pay royalties. Each of the four instruments contains a separate set of promises on a different subject and does not depend upon the others for "meaning and vitality." Phillips Petroleum Co. v. McCormick, 10th Cir. 1954, 211 F.2d 361, 365. Furthermore, there was testimony that the matters covered in Exhibits 41, 42 and 43 were negotiated prior to the July, 1962 Paris meeting.[7]

Therefore, we conclude that there were not other valid considerations which entered into the promise to pay royalties. The Paris meeting was arranged for the purpose of securing a waiver of Article XX. This was the predominant subject which was discussed at the meeting. The agreement itself is keyed to the waiver. Thus we must find and conclude that this was the consideration for the payment of the one per cent royalty. The agreement, Plaintiff's Exhibit 1, is based wholly and entirely on Article XX of the License Agreement. This was an unlawful extension of the patent monopoly, a misuse of patent whereby Plaintiff's Exhibit 1 must be held invalid and unenforceable.

The discussion of other considerations in *North Drive-in Theatre Corp.*, supra, is inapposite here. The Court of Appeals was considering it in relationship to the issue there presented whether the prior holding of invalidity of the patent resulted in an eviction and a failure of consideration. The trial judge there held that there were other considerations for the continued payments of royalties. The Court of Appeals did not disturb this ruling.

We have also considered the contention of plaintiff that any patent misuse which it might have been guilty of was in fact purged by the July 3, 1962 agreement (Plaintiff's Exhibit 1). We recognize that a misuser of patents may relent and at the same time change his ways and in such event past sins are, so to speak, forgiven.[8] But the July 3, 1962 agreement did not so operate. True, it permitted the manufacture and sale of a two-tube shock absorber contrary to Article XX, but Article XX was the basis for the promise to pay the one per cent royalty. Thus the basic agreement continued to control the relationship.

Having concluded that the plaintiff was and continued to be guilty of patent misuse, that there was a causal relationship between the patent misuse and the promise to pay royalties here in controversy, that there were not other considerations which could support this promise, that the patent misuse doctrine is in force and effect in the Tenth Circuit, and that the true rationale for the patent misuse doctrine is not merely "clean hands" but is a broad policy reason against enforcing contracts which restrain trade. It follows that the defendant is entitled to judgment dismissing the Complaint.

---

6. The defendant manufactures the two-tube units, which are sold by Columbus Parts Corporation. Both defendant and Columbus Parts are subsidiaries of AP Parts Corporation.

7. For example, Mr. Clyde W. Kitzinger, president of Oldberg Manufacturing Company, who accompanied W. R. Heckethorn to France in July, 1962, and who was present during the meetings held then, testified that "those agreements [Exhibits 41, 42 and 43] had been ironed out before we went over there."

8. Park-In Theatres v. Paramount-Richards, D.Del.1950, 90 F.Supp. 730, 740; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 498, 62 S.Ct. 406, 86 L.Ed. 367 (1942); National Lockwasher Co. v. George K. Garrett Co., supra.

Counsel is directed to prepare and submit a judgment for the signature of the Court and to do so within ten days following receipt of this opinion.